TELEGRAPH SAVINGS AND LOAN ASSOCIATION, et al., Plaintiffs,

v.

FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION, et al., Defendants.

No. 80 C 2792.

United States District Court, N.D. Illinois, E.D.

Feb. 19, 1982.

---

5. See comments of Judge Higgins in Plaintiff's Memorandum Regarding Prior Rulings, Tr. Proc. 6/30/80 at 11–12.

Baker & McKenzie, Chicago, Ill., for plaintiffs.

Roger Flahaven, Michael J. Hayes, Jerome Webb, Asst. Attys. Gen., William J. Scott, Atty. Gen., Chicago, Ill., for Schilling.

Jeremiah Marsh, Robert W. Patterson, Michael F. Duhl, John L. Rogers, III, Peter F. Lovato, III, Hopkins, Sutter, Mulroy, Davis & Cromartie, U.S. Atty. Thomas P. Sullivan, Asst. U.S. Atty. Mary Ann Mason, Chicago, Ill., for FSLIC and Federal Home Loan Bank Bd.

## MEMORANDUM OPINION

GRADY, District Judge.

This is an action brought by Telegraph Savings & Loan Association ("Telegraph" or the "Association") to remove the Federal Savings & Loan Insurance Corporation ("FSLIC") as receiver of its assets and to obtain equitable and monetary relief for harm suffered as a result of the sale of those assets. The complaint is in ten counts and alleges causes of action under a variety of state and federal statutes and constitutional provisions. On June 9, 1981, 564 F.Supp. 862, this court ordered that Count III (which contained the claim that the FSLIC was unlawfully appointed receiver of its assets) be severed from other counts and set for expedited trial.

■ Trial of Count III began on September 10, 1981, and ran with interruptions through January 7, 1982. The court heard nearly a dozen witnesses, most of them experts in the fields of finance, savings and loan associations, and accounting. Having considered the testimony and exhibits offered, the court is of the opinion that the FSLIC was lawfully appointed receiver of Telegraph's assets. For the reasons set forth below, we therefore deny the Association's application to remove that agency as receiver.

## I. Background

As we discussed in our summary judgment opinion filed June 9, 1981, pursuant to 12 U.S.C. § 1729(c)(2) (1980), the Bank Board has "exclusive power and jurisdiction" to appoint the FSLIC receiver for the assets of an insured state savings and loan association in the event that the Bank Board determines:

(A) that ... (ii) an insured institution (other than a Federal savings and loan association) has been closed by or under the laws of any State;

(B) that one or more of the grounds specified in paragraph (6)(A) of section 1464(d) of this title, existed with respect to such institution at the time a conservator, receiver, or other legal custodian was appointed, or at the time such institution was closed ...; and

(C) that one or more of the holders of withdrawable accounts in such institutions is unable to obtain a withdrawal of his account, in whole or in part;

Section 1464(d)(6)(A), referred to in subsection (B) of the foregoing statute, provides that

The grounds for the appointment of a conservator or receiver for an association shall be one or more of the following:

(i) insolvency in that the assets of the association are less than its obligations to its creditors and others, including its members: ....

In our opinion of June 9, 1981, we held that subsections (A) and (C) of § 1729(c)(2) had been satisfied and therefore granted the Bank Board summary judgment. We held, however, that there was an issue of material fact as to whether Telegraph was insolvent within the meaning of § 1464(d)(6)(A). That issue of fact was as

follows: Telegraph had been placed into receivership by the Bank Board on May 22, 1980, on the ground that it was insolvent. The Bank Board had based its determination of insolvency on monthly financial reports filed by the Association with the Bank Board at the end of every month. On April 30, 1980, Telegraph's monthly statement showed that its net worth had fallen to $450,000.00. On May 19, Telegraph's comptroller projected that between May 1 and May 19 the Association had lost over $590,-000.00 and that it would lose nearly $1 million for the entire month. On the basis of the comptroller's projections, the Bank Board determined that the Association was insolvent within the meaning of § 1464(d)(6)(A)(i) on May 22, 1981, and that it was therefore eligible for receivership on that day. In opposition to the motion for summary judgment, Telegraph submitted affidavits indicating that the Board's projections were speculative and arbitrary. Although we thought there were strong indications that the defendants' projections were reasonable, we held nonetheless that plaintiffs' were entitled to present evidence at trial on the question.

At trial, defendants took a different, and surprising, tack. Rather than dispute the reasonableness of the Bank Board's projections, plaintiffs chose to dispute, by way of an attack on the Board's interpretation of § 1464(d)(6)(A)(i), the *method* by which the Board computed insolvency. When, for reasons set forth below, these challenges to the Bank Board's interpretation of the statute ran into difficulty, plaintiffs mounted a constitutional attack on the statute. Plaintiffs now rely chiefly on this constitutional challenge.

We first address the challenges to the Bank Board's interpretation of the insolvency statute and then the constitutional issues.

## II. Challenges To The Bank Board's Construction of § 1464(d)(6)(A)(i)

Section 1464(d)(6)(A)(i) provides that

The grounds for the appointment of a conservator or receiver for an association shall be one or more of the following: (i) insolvency in that the assets of the association are less than its obligations to its creditors and others, including its members; . . . .

12 U.S.C. § 1464(d)(6)(A) (1980).

The Bank Board has consistently interpreted this statute as defining insolvency in terms of negative net worth based on a valuation of assets at book value. Thus, in determining whether an association is insolvent, the Bank Board merely subtracts all liabilities from the book value of all the assets. If the result is less than zero, the association is considered insolvent within the meaning of the statute.

Plaintiffs asserted that the statute contains certain ambiguities. Specifically, they argued that the terms "assets" and "obligations" are susceptible to interpretations other than the Board has given them and that these other constructions are more consistent with the intent of the statute.

The Bank Board's authority to interpret § 1464(d)(6)(A) is derived from § 1464(a)(1) of the same title. That section states that

In order to provide local mutual thrift institutions in which people may invest their funds and in order to provide for the financing of homes, the Board is authorized under such rules and regulations as it may prescribe, to provide for the organization, incorporation, examination, operation, and regulation of associations to be known as "Federal Savings and Loan Associations . . . .

Section 1464(d)(1) also gives the Bank Board the "power to enforce this section and the rules and regulations made hereunder." [1]

■ We decide questions of statutory construction in this case with due respect for the "venerable principle that the con-

---

1. Section 1464(d)(6)(A) also provides that "[i]f, in the opinion of the Board, a ground for the appointment of a conservator or receiver as herein provided exists," the Board is authorized to make such an appointment. The language "in the opinion of the Board" is further evidence of Congress' intent to delegate interpretation of the statute to the Board.

struction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong, especially when Congress has refused to alter the administrative construction." *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969); *Espinoza v. Farah Manufacturing Co.,* 414 U.S. 86, 94–95, 94 S.Ct. 334, 339, 38 L.Ed.2d 287 (1973). The degree of deference is enhanced where the agency participated in the development of the statute it administers, *Miller v. Youakim,* 440 U.S. 125, 144, 99 S.Ct. 957, 968, 59 L.Ed.2d 194 (1979), where the agency has applied the challenged construction consistently over a number of years, *United States v. National Association of Security Dealers,* 422 U.S. 694, 719, 95 S.Ct. 2427, 2442, 45 L.Ed.2d 486 (1975); *N.L.R.B. v. Boeing Co.,* 412 U.S. 67, 75, 93 S.Ct. 1952, 1957, 36 L.Ed.2d 752 (1973), and where "Congress has reenacted the statute without pertinent change. In these circumstances, congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." *N.L.R.B. v. Bell Aerospace Co.,* 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974). Finally, we note that "[w]e need not find that the construction is the only reasonable one, or even that it is the one we would have reached had the question arisen in the first instance in judicial proceedings." *Unemployment Compensation Commission of Alaska v. Aragon,* 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946). *See also Train v. Natural Resources Defense Council, Inc.,* 421 U.S. 60, 75, 95 S.Ct. 1470, 1479, 43 L.Ed.2d 731 (1975).

■ Before evaluating plaintiffs' statutory construction arguments, we briefly describe the legislative history of § 1464(d)(6)(A)(i). This section was added to Title 12 in 1954 with the advice of the

Bank Board itself.[2] Despite the fact that Congress generally revised § 1464(d)(6) in 1966 and made smaller revisions of § 1464(d) in 1978,[3] it has never revised the subsection giving the Bank Board the power to appoint a receiver when an association is insolvent. Further, evidence presented at trial indicated that the Bank Board has at least since 1954 consistently based its evaluation of the financial status of associations on financial data contained in so-called "Monthly Reports."[4] These reports contain entries for the total book value of an association's assets and its total liabilities. In view of the legislative history of § 1464(d)(6)(A)(i), the Bank Board's interpretation of that statute carries with it a very great presumption of validity.

■ We now examine each of plaintiffs' statutory construction arguments. Plaintiffs' first theory exploited an asserted ambiguity in the statutory term "obligations." An institution is insolvent under the statute if the "assets of an association are less than its obligations." Plaintiffs' first witness insisted that the term "obligations" was deliberately chosen instead of the word "liabilities" and that it has a narrower meaning than "liabilities." Obligations, the witness contended, are those liabilities that do not arise until the instant they are due and payable. The ramifications of this distinction, if it held water, were substantial. Time deposits, for example, comprised a large percentage of Telegraph's portfolio. Only a fraction of these time deposits came due on May 22, the date Telegraph was placed in receivership. If holders of time deposits that were due after May 22 came in on that day to withdraw their money, they would suffer substantial penalties. Assuming all such depositors appeared at once on May 22, the Association's obligations would be by virtue of the penalties

2. Sen.Rep. No. 1472, 83rd Cong., 2d Sess., *reprinted in* [1954] U.S.Code Cong. & Ad.News 2723. A similar provision was contained in the Home Owner's Loan Act of 1933. *See Fahey v. Mallonee,* 332 U.S. 245, 250–253 n. 1, 67 S.Ct. 1552, 1554–1556 n. 1, 91 L.Ed. 2030 (1947).

3. *See* Sen.Rep. No. 1482, 89th Cong., 2d Sess., *reprinted in* [1966] U.S.Code Cong. & Ad.News 3532. Sen.Rep. No. 95–1273, 95th Cong., 2d Sess., *reprinted in* [1978] U.S.Code Cong. & Ad.News 9273.

4. Tr. 1001 (Kenneth Scott).

$2,850,000.00 less than if the certificates were held to maturity. Tr. 184. If these deposits are not considered "obligations" in their full amount as of May 22, Telegraph was solvent on that date by a whopping amount of $2.5 million.

The theory was discredited, however, by witnesses for both sides. First, it became apparent that "obligations" is treated within the accounting profession as a more general term than "liabilities"[5] and that while many "obligations" of a firm are not "liabilities," all "liabilities" are "obligations." Second, the same witnesses took issue with the proposition that obligations become such only at the instant they become due. Both generally accepted accounting principles and regulatory accounting principles require that books be kept on an accrual basis. That is, revenues and expenses are allocated at time periods to reflect an enterprise's performance during those periods rather than merely listing receipts and expenses at the moment they occur. Tr. 587. Counting as obligations only those debts that come due at a given moment is totally inconsistent with accrual accounting. Moreover, according to plaintiffs' theory, an association could be solvent one moment before crushing obligations became due and insolvent the moment after. Plaintiffs' theory would prevent the Bank Board from taking action until the fatal moment had passed. There is no reason to believe that Congress intended to hamstring the agency in this way.[6] Finally, Kenneth Scott, a former general counsel of the Bank Board, testified that the broader term "obligations" might have been used instead of "lia-

bilities" because of the peculiar nature of savings and loan associations. In 1954, when the insolvency section of the receivership statute was passed, most associations were mutual; that is, they were owned by their depositors ("members") who were not considered creditors, had no legal right to interest, and no legal right to withdraw their money at will. *See generally Wisconsin Bankers Association v. Robertson,* 190 F.Supp. 90, 92 (D.D.C.1960), *aff'd* 294 F.2d 714 (D.C.Cir.1961), *cert. denied,* 368 U.S. 938, 82 S.Ct. 381, 7 L.Ed.2d 338. Mr. Scott testified that by using the broad term "obligations" the statute encompasses not only the obligations owed conventional creditors, but also the amounts due depositors.

Plaintiffs' second statutory construction argument also focuses on the term "obligations." Here, plaintiffs contended that Congress did not intend to charge an association with liabilities that are mere accounting entries the association will never have to pay. Plaintiffs point to two such items: deferred income taxes and deferred loan fees.

Telegraph argues that deferred taxes should not have been considered since they had lost money in the past few years and would have continued to lose money in the future. Since it would have had no foreseeable income, the Association should not have been charged with deferred income taxes. However, the matter is not that simple. The fact that an association has a loss in a particular year does not determine what deferred tax entry is required on its

---

5. A publication of the Financial Accounting Standards Board, "Statement of Financial Accounting Concepts No. 3" (December 1980), Defendants' Exhibit 6, states that liabilities "are future sacrifices of economic benefits arising from present obligations of a particular entity to transfer assets or provide services to other entities in the future as a result of past transactions or events." At 13. Obligations are defined in the same manual as follows: "Obligations is used with its usual general meaning to refer to duties imposed legally or socially to that which one is bound to do by contract, promise, moral responsibility. It includes equitable and constructive obligations as well as legal obligations." At 12 n. 14. The

manual then compares "liabilities" with "obligations:" "Although most liabilities rest generally on a foundation of legal rights and duties, existence of a legally enforceable claim is not a prerequisite for an obligation to qualify as a liability if the future payment or other transfer of assets to settle the obligation is otherwise probable." At 13.

6. Additionally, it became clear at trial that if plaintiffs had similarly eliminated from the left side of the balance sheet those assets that were not due to them precisely on May 22, 1980, they would still have been insolvent. Defendants' Exhibit 13.

balance sheet for that year. Under the applicable tax law, the effect of a loss in a particular year may not be known for several years. *See generally* Defendant's Exhibit 13, "Accounting Principles Board Opinion No. 11: Accounting For Income Taxes" (December 1967). Such a determination may be made only after extensive audit procedures. Again, we do not think Congress intended to stay the Bank Board's hand until its team of accountants wrestled with highly complex tax calculations.

Telegraph also argues that it should not have been "charged" with deferred loan fees. The argument implies that the unearned portion of the loan fees was treated as a liability of the association when it was in fact an asset. The simple answer to this is that the deferred loan fees were not treated as something the Association owed but rather as an offset to an asset. This correctly depicted the fact that the Association would earn its loan fee in increments over the life of the loan, not all at once in the year the loan was made.

■ We turn now to Telegraph's third statutory construction argument. Telegraph claims that "assets" should be read to mean "liquid assets" and "obligations" to mean those obligations coming due on a given day. This argument may be readily disposed of. The construction of "assets" and "obligations" proposed by Telegraph would radically alter the plain meaning of the statute. As it reads, the statute sets forth some fashion of net-worth or balance sheet definition of insolvency; that is, insolvency is determined simply by subtracting liabilities from assets. It is this definition that is used in the Bankruptcy Code, 11 U.S.C. § 101(26) (1979).[7] Plaintiffs propose a liquidity or "equitable" definition of insolvency, such as that appearing in the old Bankruptcy Code, 11 U.S.C. § 205(a) (1976). Their argument presumes, of course, that

Congress was unable to state explicitly the liquidity definition when it wanted to. The presence of the liquidity test in the old Bankruptcy Act and in a number of other statutes entirely destroys this premise. *See, e.g.,* Farm Credit Act of 1971, 12 U.S.C. § 2183(b) (1980); Securities Investor Protection Act Amendments of 1978, 15 U.S.C. § 78eee(b)(1)(A).

■ Moreover, it should be clear by now that in construing § 1464(d) the court will not embrace a construction that will hamper the Bank Board in the vigilant exercise of its authority to protect depositors and its insurance fund. Plaintiffs admitted at trial that an association could be in very bad shape financially, yet still be able to meet the liquidity test of insolvency.

We now turn to Telegraph's final challenge to the Bank Board's interpretation of the statute. Here Telegraph claims that the term "assets" must be read to mean "assets valued at fair market" rather than "assets valued at book."[8] Though this contention was somewhat longer lived than plaintiffs' previous three, we reject it also. Evidence at trial showed that in 1954 interest rates were so low that, for all practical purposes, book and market values for a mortgage were the same. It is doubtful, therefore, that Congress intended that one rather than the other method of valuation be employed. On the other hand, the Bank Board has valued assets at book since the statute was enacted and Congress has not seen fit to amend the statute to require the Bank Board to mark an association's assets to market. These two facts are very persuasive evidence that the Bank Board's construction is consistent with congressional intent.

Congress' failure to replace the book net worth test is particularly significant in light of the 1966 amendments to § 1464(d)(6).

7. The Bankruptcy Code's definition differs from the one used by the Bank Board in that it values the assets of the bankrupt business at "fair value."

8. Plaintiffs understandably hesitate to adopt this construction of the statute since the fair market value of an association will always be less than or equal to the book value. Nonetheless, there are only two ways to value assets, at book or at market. Plaintiffs' rejection of the book value test requires us to consider the other alternative.

At that time, Congress completely overhauled the procedures by which receivers were appointed by the Bank Board. In the Senate Report to the bill, the committee expressly noted that a revision of paragraph (6) was needed to deal with the growing number of institutions that were failing because of the spiralling interest rates:

> Furthermore, the present monetary situation with the extraordinary demands for credit far outrunning the available supply, the resulting upward pressure on interest rates and the consequent compulsion to obtain high yields, often at the risk of loss—have imposed an unusual burden on all financial institutions. It is not surprising that there have been in recent months a few very substantial involuntary liquidations and a few forced mergers.

Senate Report No. 1482, 89th Cong., 2d Sess. (1966), *reprinted in* [1966] U.S.Code & Ad.News 3532 at 3536–3537. Thus, even though Congress was aware that the mortgage portfolios of many associations were falling behind the market, it did not see fit to compel the Bank Board to abandon the book valuation of assets.

The only evidence indicating that Congress intended that assets be valued at the fair market value was the testimony of Kenneth Scott, the former general counsel to the Bank Board. On direct examination, Mr. Scott assented to the proposition that assets were to be valued at book. On cross, he stated that the assets were intended to be valued at "fair value." When asked if this meant fair market value, he said that it did. On redirect, Mr. Scott attempted to clear up the confusion. Thus he explained that

> The Board's reporting rules have always been on the premise that the associations would report mortgage portfolio in the standard method, which means at book value. There are individual instances in which examiners have gone behind book values to try to ascertain real values, actual market values, and require writedowns. That is done on an individualized basis. It is not the standard practice

whereby the associations prepare and report their financial statements.

Tr. at 1002.

We disagree with plaintiffs' contention that Mr. Scott's testimony demonstrates that the Board's construction of the term "assets" is clearly inconsistent with the congressional intent. What the evidence shows is that, at the time the statute was enacted, Congress was not particularly concerned with the distinction between book and fair market valuation of assets, that book value had been consistently used in accounting for the status of financial institutions, that it has been employed by the Board consistently for nearly 30 years save in certain instances in which writedowns have been required and that Congress has not amended the Act to change the Board's practice. Under these circumstances, we defer to the Board's construction of the statute.

### III. Application of the Insolvency Test to Telegraph

It is our determination, then, that the statute declares an association insolvent when its obligations, including all its liabilities, are less than the book value of its assets (the "book net worth test"). We now examine whether Telegraph was insolvent according to this definition on May 22, 1980.

In our opinion of June 9, 1981, we explored the evidence of Telegraph's insolvency as of May 22, 1980. Our discussion there was based on the premise that the book net worth test controlled the case. Since that premise has now been confirmed, we simply review the evidence discussed in our earlier opinion.

From July 1, 1979, to April 30, 1980, Telegraph's book net worth steadily declined from nearly $5 million to $450,000.00. The operational losses for April 1980 alone exceeded $734,000.00. On May 19, Telegraph's comptroller made the following projection:

> Based upon my review of the books and records of Telegraph as of May 19, 1980 and taking into consideration my knowledge of the financial circumstances of Telegraph, I estimate that for the period

May 1 through 19, 1980, Telegraph had lost $591,778.29 and I projected that for the entire month of May, Telegraph would lose $983,147.86.

Conover Affid., ¶ 3 (8–26–80). On the basis of the projections of Telegraph's own comptroller, Telegraph had a negative book net worth of approximately $142,000.00 on May 19 and of approximately $240,000.00 on May 22. We note that Telegraph's treasurer estimated that, on the basis of April's operating loss, the Association had a negative net worth of $89,000.00 on May 22, 1980. Seely Affid., ¶ 15 (8–26–80).

In our opinion on defendants' summary judgment motion, we observed that the book net worth figures up to May 1, 1980, were not disputed. We stated, however, that the Bank Board's projection that Telegraph would have had a negative book net worth on May 22, 1980, was open to question. We also held that the burden of proving that the projection was unreasonable lay upon the plaintiffs. As noted above, however, at trial plaintiffs chose not to attack the reasonableness of the Bank Board's projection of Telegraph's book net worth, but rather the concept of book net worth itself. Defendants successfully repelled plaintiffs' attack on the book net worth test. We now find, in light of plaintiffs' failure to present evidence showing that the Bank Board's projection that Telegraph had a negative book net worth on May 22, 1980, was unreasonable, that the Bank Board's projection was reasonable and that Telegraph was insolvent within the meaning of § 1464(d)(6)(A)(i).

## IV. Constitutional Challenge to § 1729(c)(2)

As Telegraph's attacks on the Bank Board's application of the statute have been of increasing generality, it is appropriate that their final argument is directed at the constitutionality of the receivership. It is important at the outset to identify the constitutional objections that Telegraph is *not* making. First, it does not claim that the Bank Board's action constituted a taking of property within the meaning of the Fifth Amendment. Plaintiffs' remedy for a taking is, of course, just compensation. The fair market value of Telegraph's assets, however, was somewhere in the area of negative $30 million.[9] Nor does Telegraph argue that the receivership was a violation of the Contract Clause. That Clause only guarantees against government conduct that impairs contracts, not that which is intended to preserve them.

Rather, it is Telegraph's claim that § 1464(d)(6)(A)(i), which is incorporated by § 1729(c)(2)(B), was applied by the Bank Board in a manner that violated substantive due process. The argument is as follows. The Bank Board took custody of Telegraph under 12 U.S.C. § 1729(c)(2), the statute that gave the Bank Board power to obtain custody over *state* chartered savings and loan associations. The only reason Congress extended the Bank Board's power to receive the assets of state associations was to enable it to protect the assets of the Federal Savings & Loan Insurance Corporation. As we stated at pages 12–13 of our opinion of June 9, 1981, until 1968 the FSLIC was primarily liable on depositors' claims against failing associations but it was seldom given control over the association's assets. Rather, control remained with a state receiver who was not responsible to the federal agency. Section 1729(c) was intended to protect the funds of the FSLIC from dissipation in the hands of a state receiver. Telegraph argues that the Bank Board's test for taking custody of an association under § 1729(c) must be related to the risk that the association poses to FSLIC's insurance fund. If the receivership criteria do not tell the Board when an association puts the insurance fund at risk, then it is irrational and violative of substantive due process.

Now, says Telegraph, § 1729(c)(2)(B) provides that the Bank Board may take custody of an association if one or more of the grounds specified in § 1464(d)(6)(A) existed. One of these grounds is that the association

---

**9.** Statement of plaintiffs' counsel at final argument, Tr. 21 (January 7, 1982).

is insolvent or, according to the Bank Board, that the association have a negative book net worth. It is Telegraph's contention that the negative book net worth test bears absolutely no relation to the purpose of § 1729(c), namely, safeguarding the FSLIC's insurance fund; that is, the mere fact that an institution has a negative book net worth is *no indication whatsoever* that the association imperils FSLIC's insurance fund.

Telegraph claims that the risk to FSLIC's insurance fund can only be gauged by an insolvency formula that is based on the *fair market value* of the failing association. When the FSLIC is appointed receiver of an association, its exposure is equal to the amount that the depositors claim over and above the amount the agency will receive from the liquidation. FSLIC has no choice but to liquidate or sell the association on the open market at its fair market value; thus, the amount of money it will have to pay depositors—that is, the amount by which its funds will be put at risk—can only be determined with reference to the fair market value of the association.

Plaintiffs illustrate the point with a chart showing the book net worth and fair market value of a number of savings and loan associations operating in Chicago. Plaintiffs' Supplemental Post-Trial Brief, Exhibit B. This chart shows that the associations that have the smallest book net worth have the largest fair market net worth and the associations that have the largest book net worth have the smallest fair market net worth.[10] For example, Morgan Park Savings & Loan has a book net worth of $23,-000.00 and a fair market net worth of negative $569,000.00. Talman Savings & Loan has a book of $112,268,000.00 and a fair market net worth of negative $660,237,-000.00. The conclusion Telegraph draws from this chart is that, upon liquidation, those associations with a higher book pose greater risks to FSLIC's insurance fund. In plaintiffs' words,

> [T]he agency's test does not tell the agency when their insolvency risk begins, it does not identify the institutions which pose the insolvency risk, and it does not tell them the extent of the insolvency risk posed. It is a truly meaningless comparison of assets and obligations as far as their funds is concerned.

Plaintiffs' Supplemental Post-Trial Brief, p. 12.

Before we evaluate this argument, we briefly discuss the standard of review in substantive due process cases. In order to survive a substantive due process challenge, the government need only show that the statute is "rationally based and free from invidious discrimination." *Richardson v. Belcher,* 404 U.S. 78, 81, 92 S.Ct. 254, 257, 30 L.Ed.2d 231 (1972), *quoting Dandridge v. Williams,* 397 U.S. 471, 487, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970). Long ago, Justice Brandeis, in a dissent

---

**10.** The following is a sample of every fourth institution appearing on plaintiffs' chart:

| | BOOK NET WORTH | BOOK ASSETS | FAIR MARKET NET WORTH |
|---|---|---|---|
| Morgan Park | 23 | 2,958 | (569) |
| Ft. Dearborn | 800 | 28,646 | (4,929) |
| Allied | 1,824 | 32,516 | (4,679) |
| Central | 2,872 | 70,468 | (11,222) |
| Archer | 4,599 | 42,280 | (3,857) |
| Second | 7,170 | 101,560 | (13,142) |
| Liberty | 19,145 | 259,393 | (32,734) |
| Talman | 112,268 | 3,682,527 | (660,237) |

(All figures above are in thousands of dollars). The fair market net worth is calculated by discounting the book value of the assets by 20 per cent. Testimony at trial indicated that, at the going interest rates, the discount is between 20 per cent and 30 per cent.

Since fair market net worth is calculated merely by discounting at a fixed rate the book value of an association's assets, those associations with greater book assets will have a greater discount and therefore a smaller fair market net worth. Thus, it should be noted that the rankings of the associations according to book assets and book net worth are virtually identical: The association having the smallest book assets has the smallest book net worth and the association having the greatest book assets has the greatest book net worth.

It is also worth noting that the book value of an association's assets is not a randomly selected figure. The assets of a savings and loan association consist primarily of home mortgages and the book value of these mortgages represents the principal that the mortgagor must eventually repay.

that has now received the approval of the Court, *see Breard v. City of Alexandria,* 341 U.S. 622, 632–633, 71 S.Ct. 920, 927, 95 L.Ed. 1233 (1951), described the role of federal courts in substantive due process cases:

> Our function is only to determine the reasonableness of the legislator's belief in the existence of evils and in the effectiveness of the remedy provided. In performing this function we have no occasion to consider whether all the statements of fact which may be the basis of the prevailing belief are well-founded; and we have, of course, no right to weigh conflicting evidence.

*New State Ice Co. v. Liebmann,* 285 U.S. 262, 286–287, 52 S.Ct. 371, 377, 76 L.Ed. 747 (1932). More recently, the Court has stated that

> [T]he judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines (citation omitted); in the local economic sphere, it is only the invidious discrimination, the wholly arbitrary act which cannot stand consistently with the Fourteenth Amendment.

*City of New Orleans v. Dukes,* 427 U.S. 297, 301, 303–304, 96 S.Ct. 2513, 2513, 2516–2517, 49 L.Ed.2d 511 (1976).[11]

 Plaintiffs argue that a higher standard of review is warranted in this case since it "concerns fundamental constitutional rights such as the right of contract and the right of property ownership." Plaintiffs' Supplemental Post-Trial Brief at 19. This is not the law. The Supreme Court has over the years identified a number of "fundamental rights" which, when implicated by an act of government, trigger heightened judicial scrutiny. Among such rights are the rights to association, *N.A.A.C.P. v. Patterson,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); to travel, *Shapiro v.*

*Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); to vote, *Harper v. Virginia Board of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); to fair criminal process, *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963); and to privacy, *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). The right to do business has never been considered a fundamental right. On the contrary, in a number of cases, the Supreme Court has held that the government may regulate or even *prohibit* an occupation or business without running afoul of the Due Process Clause, provided that the law bears a rational relation to a legitimate purpose.[12] *New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (upheld law prohibiting street vendors in portions of the city); *Ferguson v. Skrupa,* 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963) (upheld law prohibiting debt adjustment except by lawyers); *Williamson v. Lee Optical of Oklahoma,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955) (upheld law prohibiting sale of prescription glasses by optometrist without a prescription); *Breard v. City of Alexandria,* 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951) (upheld statute forbidding door-to-door solicitation). In each of these cases, government action drove persons from their businesses and, more likely than not, disturbed numerous contractual relationships. Nonetheless, the government's action was subject only to a rational basis test. Moreover, the scope of the disturbance—whether it is the hot dog vendor in New Orleans who must surrender his pushcart or the banker in Chicago who must part with a financial empire—is, of course, no consequence under the Due Process Clause.

This point was forcefully made in *U.S. v. Central Eureka Mining Co.,* 357 U.S. 155, 78 S.Ct. 1097, 2 L.Ed.2d 1228 (1958). In 1942,

---

11. The same standard applies to substantive due process claims brought against the federal government under the Fifth Amendment as applies to claims brought against the states under the Fourteenth. *Richardson v. Belcher,* 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1972).

12. In *Ferguson v. Skrupa,* 372 U.S. 726, 732, 83 S.Ct. 1028, 1032, 10 L.Ed.2d 93 (1963), the Supreme Court stated that for substantive due process purposes it was neither "able [nor] willing to draw lines by calling the law 'prohibitory' or 'regulatory'."

the government, in an action that came extremely close to the nationalization of an industry, ordered all non-essential gold mines to close down in order to free the machines for war-related work. Central Eureka sued on the theory that the order constituted a taking for which it was entitled to compensation and on the theory that the law violated substantive due process. In a decision that is more noteworthy for its holding that no taking had occurred, the Court also held that the law was rationally related to a legitimate government objective and, thereby, passed constitutional muster. If substantive due process challenge to government action that effectively took control over the deployment of the assets of a business is evaluated by the rational basis test, we doubt that a stricter standard of review is warranted in this case.

■ We conclude, then, that the Bank Board's application of § 1729(c)(2) must be judged under the rational basis test.[13]

■ It is the court's opinion that plaintiffs have failed to show that the book net worth test is a "wholly arbitrary" or irrational means to protect FSLIC's insurance fund.

First, book net worth includes not only the book value of an association's assets, but also the amount of capital invested by the owners. In any business, the owners' interest is that which is left after deducting the total obligations from the total assets. The figure that remains is the net worth and it is, in a very real way, the owners' stake in the business. As defendants point out, when net worth is used up, the owners have lost their stake in the business and they continue in business only by gambling with the depositors' money, hoping that at some point the losses will reverse and their equity will be restored. But the depositors are of course insulated from loss by the FSLIC insurance fund. Thus, when book net worth sinks below zero, the real gambler is the FSLIC.

The variance between book net worth and fair market net worth illustrated by plaintiffs' chart loses much of its punch when we focus not on the extent of risk to the FSLIC's fund *upon liquidation,* but on the economic indicia that intervention is warranted. Here, the Bank Board, like the accounting profession traditionally, has chosen to rely exclusively on book net worth figures. Insofar as these figures bear a relationship to the owner's equity in the business, we cannot say that the Bank Board's test—as a test for determining *when to intervene,* rather than a test for determining the *cost of intervention*—is irrational. The Bank Board's test is based on the age-old adage that a person is more careful with his own money than he is with his neighbor's. While this thinking may not hold true in all cases, it is undeniably rooted in experience.

As an indicator of financial instability, we note that the negative book net worth test is far more favorable to the institution than the negative fair market value test. As plaintiffs' chart illustrates, most associations currently have a negative fair market value; only a very few have a negative book net worth. These latter associations are distinguished from other associations in that they have experienced larger operating losses.[14] While operating losses may not tell the Bank Board much about an associa-

**13.** At final argument the court suggested that under the traditional rational basis test, plaintiffs would have to prove that the legislation bears no *conceivable* rational relationship to a legitimate government objective. *See, e.g., U.S. Railroad Retirement Board v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1981). Plaintiffs hotly dispute the application of this standard, particularly where the legislative history states what Congress thought the relationship was. In view of our finding, *infra,* that the legislation is rationally related to the objectives *in the way Congress intended,* we need not resolve the question of the applicability of the more deferential standard to this case.

**14.** Telegraph, for example, had experienced in March of 1980 operating losses of $2.58 per $100.00 of assets which proved to be $2.87 or 990 per cent behind the class of associations to which it belonged. For the 12 months ending in March of 1980, Telegraph was 447 per cent behind its class in operating results. Defendants' Exhibit 16.

tion's ability to weather a short financial squall, the persistence of such losses over time is indisputably relevant to any evaluation of an association's long-term fitness. Insofar as the negative book value test reflects the trends of an association's operating losses, we cannot say that it bears no rational relation to the preservation of FSLIC assets.

■ Second, evidence was presented indicating that the financial community at large attaches significance to book net worth figures. We refer particularly to the deposition of Jay Janis, the former Chairman of the Bank Board.[15] Plaintiffs undoubtedly disagree with Mr. Janis' comments. It is critical, however, to bear in mind that we are analyzing this case for its substantive due process defects. As the Supreme Court has stated, "The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought." *Williamson v. Lee Optical Co.,* 348 U.S. at 488, 75 S.Ct. at 464; *Dandridge v. Williams,* 397 U.S. 471, 484, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970). The sentiment expressed in *Lee Optical* is no less applicable to a challenge based on the Fifth Amendment Due Process Clause. In either case, a court's deference is based on the institutional inability of a court to choose between competing economic theories. If anything is clear from the last two decades in this country, it is that economic theories are far from certain. In such circumstances, it is particularly appropriate that this court refrain from second-guessing the agency that has been recognized by Congress as possessing a certain amount of expertise in a complex field.

Finally, we hold that the book net worth test has some relationship to the preservation of public confidence. For tactical reasons that are obvious, plaintiffs have sought to focus the court's attention on only one purpose of the receivership statute, i.e., the

---

**15.** The deposition of Jay Janis contains the following colloquy:

A ... Insolvency to me is something in the market place will soon lead to inability to meet obligations.

Q Can you explain to me what you mean by that?

A Yes. When an association runs out of new worth or even when it is close to running out of net worth, it is in a difficult position. The association has to deal with a number of factors and elements in the outside world.

For instance, it has to deal with the investment banking community in Wall Street. That community is keyed in helping the institution to obtain large certificates of deposit, jumbo certificates as they are known in the industry, over $100,000.

The institution also has to deal with creditors. These creditors are concerned about the financial health of an institution.

An institution also has to deal with its depositors, those who place savings at an institution and rely on its financial condition for continuing to make such deposits.

An institution also raises funds through outside borrowings and those who are lenders, relying on institutions' financial condition. Likewise, an institution deals with a whole set of dealers in the business community and in the financial world who also look to their financial condition.

Now, the key issue for all of them is the issue of the insolvency of the association and net worth of the association is absolutely central to their determination about the financial condition of an institution.

So when an institution is reaching insolvency or in fact has reached it, it is my judgment that those sources of funds that they normally would look to and that I have previously mentioned are circumscribed by the financial condition, i.e., the lack of net worth.

Q So that if an institution—I am trying to relate the discussion back now to the subject I raised before, the ability or inability of an institution to meet the obligations when it came due. So if an institution, in your view, is at or near zero net worth situation, then it also can be characterized as being very close to a situation where it would be unable to meet its obligations as they become due; is that accurate?

A It will be unable to obtain further funds and an institution which cannot obtain funds is an institution that can't operate.

Q But what if an institution had a zero or a negative net worth and was still able to obtain funds. Would you characterize that institution as insolvent?

A Yes.

Deposition of Jay Janis at 69–70 (August 10, 1981).

protection of the integrity of FSLIC's insurance fund. They have based their constitutional challenge on the premise that this was the only purpose served by § 1729(c).[16] But at the time Congress enacted § 1729, it recognized that the integrity of FSLIC's funds and preservation of public confidence in savings and loan associations were intertwined:

Federal insurance of savings accounts is fundamental to the financial stability of the entire savings and loan industry. The home building industry and millions of American home buyers depend upon savings and loan associations to help finance the construction and purchase of homes. The public has placed more than $120 billion of its savings in insured savings and loan associations. The ability of the savings and loan industry to help meet the Nation's housing needs would not have been possible without the public being confident that their savings were safe and secure. Much of the credit for maintaining this public confidence must be attributed to the savings account insurance provided by the Federal Savings and Loan Insurance Corp.

Senate Report No. 1263 U.S.Code Cong. & Admin.News 1968, pp. 2530, at 2535–2536.

■ It is also evident from the legislative history of § 1464(d)(6)(A), which is incorporated into § 1729(c), that federal receiverships were generated, at least in part, by the need to preserve the public's confidence in financial institutions. In the Senate Report to the 1966 amendment of § 1464, it was stated:

The vital importance of sound and effective systems of banks and savings and loan associations to the continued economic growth of the country is clear. The banking system is a fundamental part of our monetary system and the Nation's $130 billion of demand deposits represents the principal element of the Nation's money supply. Banks and savings and loan associations are among the

principal financial intermediaries of the Nation, holding about $300 billion in savings and channeling some $30 billion of new savings each year into homebuilding and other productive fields.

Senate Report No. 1482 (August 18, 1966) 89th Cong., 2d Sess. at 3536, *reprinted at* 1966 U.S.Code & Ad.News 3532, 3536. Inasmuch as the Senate Committee recognized the importance of the accumulation of deposits, it recognized the importance of maintaining the public's belief that its savings were secure. Section 1464(d)(6)(A) and, therefore, § 1729(c) were intended, at least in part, to preserve the public's confidence.

■ The Bank Board's use of the book net worth approach to insolvency is rationally related to the preservation of the public's confidence. Mr. Janis' deposition testimony quoted above indicates that the public is likely to pay considerable attention to net worth figures in determining whether to deposit money in an association. It is also possible that the public would lose confidence in the watchdog agencies if it became known that the agencies did not take seriously a substantial impairment of an association's net worth. Moreover, should the public lose confidence in a particular association, the big loser would be the FSLIC. As the flow of deposits stop, the association will have less money to work with and will become less credit worthy. The more the association's position deteriorates, the more likely it is that the FSLIC will be called upon to pay.

■ For these reasons, we find that § 1729(c) as applied by the Bank Board was neither arbitrary nor irrational. The most that may fairly be said about the Bank Board's conduct in this case is that it may have proceeded from an overabundance of caution. Many persons, including those members of Congress who gave the Bank Board virtually a free hand in regulating the field, may believe that there can never be enough caution when other people's

---

16. In our opinion of June 9, 1981, we identified the protection of FSLIC's insurance fund as the main purpose of § 1729(c). But, as the legislative history quoted *infra* indicates, the preservation of public confidence is inseparable from the integrity of the FSLIC's assets.

money is on the line. This appears to be what the legislators had in mind when they stated in 1966 that:

> The continued economic growth of this country is clearly dependent upon the existence of financially sound and capably managed private lending institutions . . . In such cases (in which institutions are improperly managed), it is essential that the Federal supervisory agencies have the statutory and administrative facility to move quickly and effectively to require adherence to the law and cessation and correction of unsafe or improper practices.

Senate Report No. 1482 at 3536.

In the absence of the Bank Board's use of arbitrary or irrational standards, this court will not interfere with the agency's exercise of its delegated authority.

We therefore find against plaintiffs in their action to remove the receiver appointed by the Bank Board and enter judgment for defendants on Count III of the complaint.[17]

---

**17.** Count V of the Second Amended Complaint charges William J. Schilling, the Commissioner of Savings and Loan Associations for the State of Illinois with conspiracy to violate the federal statutes, 12 U.S.C. §§ 1464(d)(6)(A) and 1729(c)(2). Since we have found that neither of these statutes were violated in connection with the receivership of Telegraph, judgment in favor of William J. Schilling will be entered on Count V.