In re S.N. BROWN ELECTRICAL CORPORATION, Debtor.

Andrew LEMELMAN, Trustee,

v.

Samuel N. BROWN, et al.

Bankruptcy No. 90–14657–WCH.
Adv. No. 91–1579.

United States Bankruptcy Court,
D. Massachusetts, E.D.

Jan. 21, 1992.

Andrew Cummings, Gargill, Sasoon & Rudolph, Boston, Mass., for trustee.

Charles P. Gamer, Cambridge, Mass., for Samuel Brown, et al.

DECISION

WILLIAM C. HILLMAN, Bankruptcy Judge.

This matter was heard upon the trustee's complaint to recover certain alleged prefer-

ential payments from defendant Samuel Brown ("Brown"). The other defendant, Paul A. Morgida, has defaulted and was not involved in the hearing.

## FINDINGS OF FACT

1. Debtor was engaged in the electrical contracting business for a number of years.

2. Brown was the president of debtor and owned 92% of its shares at the time of filing. It is undisputed that he was an insider within the meaning of § 101(31) of the Bankruptcy Code.

3. Debtor maintained its books on an accrual fiscal year basis, with an April 30 year end.

4. For the year ending April 30, 1989, debtor's audited financial records indicated a net equity of $250,359.05. That balance sheet also indicated two non-current liabilities, $75,675.00 for "Deferred Federal Corp. Tax" and $41,345.00 for "Deferred State Corp. Tax."

5. The balance sheet also indicates a "Loan Payable—Officer" in the amount of $50,000.00. There is no evidence of a note or other documentation for the loan.

6. There is no evidence of the value of the assets of debtor other than as contained in the financial records.

7. Debtor maintained its books in accordance with accepted tax accounting methods which permit the deferral of taxes on certain earnings based upon the portion of the contract which has been completed. The deferred tax figures were determined by debtor's accountants based upon estimates of federal and state taxes which would be payable in the future based upon such contracts.

8. The deferred tax figures were taken as a deduction in determining the net equity of the debtor as of the statement date.

9. Debtor's internally generated accounting records indicate the following profits or losses for the early months of fiscal 1990:

| Month | Profit (Loss) |
| --- | --- |
| May | 52,774.57 |
| June | (24,080.35) |
| July | (55,078.37) |
| August | (162,447.23) |
| | (188,831.38) |

10. There is conflicting evidence as to the operating results for the month ending September 30, 1989. Debtor had produced three internal financial statements with different results, the primary change being in the "Billings in Excess of Cost/GP" account. The Court finds that the weight of the evidence supports a conclusion that Exhibit 8B, which shows a negative total equity of $6,222.60, is correct. This would demonstrate an operating loss of $67,750.27 for the month, and a cumulative loss for the first five months of the fiscal year of $256,581.65.

11. Deducting the cumulative loss from the opening net equity, absent any other adjustments, would place debtor's net worth at a negative $6,222.60 as of the end of September.

12. There are no financial records for the months of October and November, 1989, in evidence.

13. At the end of December, 1989, the balance sheet shows a negative net worth of $66,618.70. This would indicate (there is no evidence to the contrary) an operating loss of $60,396.10 for the October—December period.

14. Evidence demonstrates a loss of $93,044.82 for the month of January, 1990, and $145,974.19 for the month of February, 1990.

15. There was no adjustment of the deferred tax accounts for any month considered in the above formulation.

16. The preferences sought to be recovered are for checks as follows:

| Check# | Dated | Amount | Clears bank |
| --- | --- | --- | --- |
| 4026 | 09–25–89 | $10,000 | 09–28–89 |
| 4068 | 10–30–89 | $10,000 | 11–02–89 |
| 4094 | 11–27–89 | $10,000 | 11–30–89 |
| 4217 | 01–19–90 | $ 5,000 | 01–23–90 |
| 4263 | 02–20–90 | $ 2,500 | 02–23–90 |
| | | $37,500 | |

17. The amount of tax deferrals is computed upon estimated taxable income at the rate of 30% for federal taxes and 9.5% for state taxes.

18. Adjustment of tax deferral accounts is normally handled by the accountants at the end of a fiscal period, and not periodically by internally generated balance sheets.

## DISCUSSION

### The issue of solvency

■ The trustee carries the burden of demonstrating that the transfer in question was made while the debtor was insolvent. Bankruptcy Code § 547(g). The test of solvency is whether the fair value of the assets of the debtor exceeded its liabilities at the time of the transfer. Bankruptcy Code § 101(32). The § 547(f) presumption is inapplicable as the transfers were made more than 90 days before the filing.

■ As indicated above, if no further adjustments are to be made, the debtor became insolvent during the month of September, 1989, and, with the possible exception of the September check, all of the others were issued while insolvency continued.

Brown argues, however, that the tax deferrals are not truly expenses which should be considered in determining net worth, since the continuing operating losses would eliminate the necessity for the payment of any tax. The trustee, of course, disagrees.

There is surprisingly little case law on the point, and what there is may be conflicting. The trustee relies upon *Telegraph Savings & Loan Ass'n v. Federal Savings & Loan Corp.*, 564 F.Supp. 880 (N.D.Ill. 1982), *aff'd on other grounds*, 703 F.2d 1019 (7th Cir.1983). Brown counters with *Sierra Steel, Inc. v. Totten Tubes, Inc. (In re Sierra Steel, Inc.)*, 96 B.R. 275 (Bankr. 9th Cir.1989).

In *Telegraph* the issue was insolvency under the then FSLIC statute, which had a different definition of "insolvency," but that need not concern us here. The plaintiff, alleging that it was not insolvent, claimed that the tax deferral entries should not be considered as obligations of the association but were "mere accounting entries the association will never have to pay." 564 F.Supp. at 886. The court disagreed:

> Telegraph argues that deferred taxes should not have been considered since they had lost money in the past few years and would have continued to lose money in the future. Since it would have had no foreseeable income, the Association should not have been charged with deferred income taxes. However, the matter is not that simple. The fact that an association has a loss in a particular year does not determine what deferred tax entry is required on its balance sheet for that year. Under the applicable tax law, the effect of a loss in a particular year may not be known for several years.... Such a determination may be made only after extensive audit procedures. Again, we do not think Congress intended to stay the [Federal Home Loan] Bank Board's hand until its team of accountants wrestled with highly complex tax calculations. *Id.*

*Sierra Steel* on the other hand dealt with a manufacturing company, much closer on its facts to the debtor. The bankruptcy court made a factual determination that the inclusion of the tax deferrals was not "born out by the evidence" because debtor was "operating at significant losses and would not have had to pay income taxes for the period in question." *Quoted at* 96 B.R. at 278. The Bankruptcy Appellate Panel affirmed.

The Court considers *Telegraph* to be driven by regulatory necessity rather than a primary search for the meaning of "insolvency." It relies heavily on accounting procedures and the need for protection of depositors. *Sierra Steel* is a more realistic approach in the bankruptcy context and is adopted by this Court:

> "The authorities cited by the debtor do not compel the conclusion that the Bank-

ruptcy court must follow GAAP [Generally Accepted Accounting Principles] in making solvency determinations. Requiring application of GAAP would make accountants and the board which promulgates GAAP the arbiters of insolvency questions. Clearly the Code provides that judges should make such decisions. Furthermore, there is no policy reason why judges should not be allowed to consider subsequent events ... in valuing assets and determining liabilities.... Even if the Panel were to follow GAAP in making an insolvency determination under section 547, there is no evidence ... that GAAP requires the inclusion of deferred income tax in determining insolvency."

96 B.R. at 278 (footnotes omitted).

Nor is there any evidence in the present case as to the requirements of GAAP as to a determination of solvency, if in fact any such exist.

Having reached the conclusion that the deferral is not appropriate in computing bankruptcy insolvency, given the continuing losses in fiscal 1990, it is necessary to compute the effect of that determination on the issue before the court.

The total tax deferral, state and federal, is $117,020. This, according to the testimony of debtor's accountant, represents an estimate of the combined 39.5% tax rate on taxable income of the debtor. That amount computes to 39.5% of $296,253.17. That is, if the debtor should incur the last amount in operating losses, it would not have to pay any of the estimated deferrals.

By the end of September, 1989, debtor had accumulated $256,581.65 in current operating losses. That loss would free up $101,349.76 of the tax deferrals, leaving $15,670.24 in that account. Adding the amount released from the deferral account to the previously computed month-end net equity of negative $6,222.60, would give debtor a positive net equity of $95,127.16 at that point. As a result, the September check does not represent a preferential transfer.

As noted, failure of proof makes it necessary to treat the last quarter of 1989 as a single period, during which time an additional loss of $60,396.10 was incurred. The tax deferral released by that loss would be $23,856.46, but only $15,670.24 remains in the account, making our net equity reconciliation:

| | |
|---|---|
| Balance at end of September, 1989 | $95,127.16 |
| Less: Oct.–Dec. losses | (60,396.10) |
| Plus: Balance in deferral account | 15,670.24 |
| Ending net worth | $50,401.30 |

This demonstrates that the debtor ended calendar 1989 with a positive net worth; hence, the checks issued in October and November were not preferential transfers.

*The issue of preferential amount*

■ The losses for January and February, 1990, eliminated all net equity. The checks issued on January 19, 1990, and February 20, 1990, were drawn during a period of insolvency. As a result, it becomes necessary to look at other elements of the definition of preferential transfers.

The fifth element is that the payment enables the creditor to receive more than

such creditor would receive if the transfer had not been made and the creditor received payment of the debt under the provisions of the statute. Bankruptcy Code § 547(b)(5).

As noted above, there was no other evidence introduced as to the fair value of debtor's assets other than the financial records. Plaintiff seeks to adjust those figures by reference to the pleadings filed in connection with the principal case by a creditor seeking relief for stay.

Allegations in pleadings are not evidence. Plaintiff has not introduced anything else to assist the court in determining the fifth

element of preferences, and it was his burden to do so. Bankruptcy Code § 547(g). As Judge McGuire has noted, such a presentation is sloppy and there is no excuse for a trustee, in possession of all of the facts concerning the debtor, not to present them to the court. *Lawson v. Ford Motor Co. (In re Roblin Inds., Inc.)*, 127 B.R. 722, 723–724 (Bankr.W.D.N.Y.1991).

The Court finds that the plaintiff has failed to satisfy its burden of proving the fair value of the assets of the debtor against which the Court could test the January and February transfers.

### CONCLUSIONS OF LAW

All challenged transfers except those for the months of January and February, 1990 are not preferential since the debtor was not insolvent at the time of such transfers. The Court finds for the defendant as to the latter transfers as the trustee has made not the slightest effort to satisfy his burden of proof as to fair value.