In re **PARKER STEEL COMPANY**, Debtor.

**John J. HUNTER, Trustee** Plaintiff,

v.

**SOCIETY BANK & TRUST, Defendant.**

Bankruptcy No. 90–02878.
Adv. No. 90–3283.

United States Bankruptcy Court, N.D. Ohio, W.D.

Dec. 10, 1992.

See also 149 B.R. 856.

Russell Miller, Marvin Robon, Toledo, OH, for defendant.

John Carey, Myrna Shuster, Toledo, OH, for plaintiff/trustee.

## OPINION AND ORDER GRANTING PLAINTIFF/TRUSTEE JUDGMENT FOR RECOVERY OF PREFERENTIAL AND FRAUDULENT TRANSFERS

WALTER J. KRASNIEWSKI, Bankruptcy Judge.

This matter came on for trial, on September 30, 1992, upon plaintiff/trustee's second amended complaint for avoidance of transfers, preferential, fraudulent and post-petition, of funds and assets by Debtor to defendant Society Bank in an amount approaching $3,000,000. Upon consideration of the evidence adduced at trial and the record herein, the court finds that certain transfers made to defendant should be avoided, and that the trustee should be granted judgment against defendant in the amount of $2,148,499.43.

### FACTS

On August 20, 1990, an involuntary petition under chapter 7 of title 11 was filed against Debtor Parker Steel Company. On August 28, 1990, Debtor converted its case to a voluntary case under chapter 11 of title 11. Debtor is engaged in the wholesale and brokerage of steel. On September 14, 1990, a second amended complaint was filed for avoidance of preferential and fraudulent transfers to defendant Society Bank & Trust. On December 6, 1990, Debtor's case was reconverted to a case under chapter 7 and plaintiff was appointed trustee of Debtor's estate.

Plaintiff, in the instant complaint, seeks to avoid certain payments, as preferential. Plaintiff claims that defendant received payments from Debtor, while insolvent, within one year of Debtor's petition, benefitting certain guarantors. Plaintiff also seeks to avoid certain transfers, as fraudulent, arguing that same were made with an intent to hinder, delay or defraud. Finally, plaintiff asserts that defendant has received unauthorized post-petition payments which should be recovered for the benefit of Debtor's estate. Defendant argues that plaintiff was not insolvent at the time of the transfers, that it is a secured creditor of Debtor, that said payments were in the ordinary course of business or earmarked and that no fraudulent conveyances were made.

Plaintiff John J. Hunter testified that after his appointment, he reviewed Debtor's books, premises, equipment and inventory. Debtor had two loans with defendant: a line of credit loan agreement dated September 30, 1988 in the amount of $2,500,000, and a term note dated November 16, 1987 in the amount of $600,000. Stipulated Exhibits A and E. These two loans were guaranteed by Debtor's principals, Messrs. Paul and Leo Goldner, and form the basis for the instant action.

Mr. Hunter stated that accounts totaling about $314,000 were turned over to him. He indicated that of this amount, approximately $108,000 represented disputed accounts and approximately $44,000 represented uncollectible accounts. He further testified that he employed Ms. Pat Almester, Debtor's bookkeeper, to continue her duties in that capacity which included postings of accounts receivable. Mr. Hunter's opinion, based upon a conversation with Ms. Almester, was that Debtor had a systematic failure to recognize uncollectible accounts receivable. That is, although Debtor's books would reflect that steel was shipped, the steel may have subsequently been returned after the product failed the customer's chemical analysis. In such event, however, Debtor would fail to delete that account receivable from its books.

Additionally, upon review of Debtor's books, Mr. Hunter became aware of an outstanding potential liability to Sharon Steel Corp. (hereinafter referred to as "Sharon"). Sharon had, pre-petition, in 1988, filed a lawsuit against Debtor in Pennsylvania seeking damages for breach of contract as a result of Debtor's non-delivery of steel. Mr. Hunter engaged counsel to assist Debtor's Pennsylvania counsel in an attempt to resolve that dispute. Mr. Hunter informed the court that he was advised that Debtor's liability was 100% and that the claim approached $1,800,000. Mr. Hunter, subsequently, compromised this claim for a lesser sum. *See* Defendant's Exhibit 66.

Finally, upon Mr. Hunter's review of Debtor's books, it appeared to him that Debtor began paying down its outstanding balance on the line of credit with defendant in February or March of 1990, after defendant had declared the loan in default. During that same time, Debtor was not paying its trade payables.

Debtor's offices were located on Monroe Street, Toledo, Ohio. The leasehold improvements of the premises were owned by Debtor's principals, Messrs. Leo and Paul Goldner. These improvements were leased to Debtor at $25,000 per year. Mr. Hunter stated that he was familiar with rental space in the area in which Debtor's building was located and believed that this amount was well in excess of its fair market value and he, therefore, attributed no value for these leasehold improvements to the estate. Furthermore, Mr. Hunter opined that, although the offices were "sumptuous", the market for this office building was limited as the area in which the building was located was somewhat deteriorated, necessitating security of the premises.

Mr. Hunter also reviewed Debtor's inventory housed at a warehouse at 810 Chicago Street, Toledo, Ohio. This warehouse was operated by Interstate Metal Processing (IMP). In order for Mr. Hunter to view the inventory, it was necessary that he make an appointment with, and be escorted by, an IMP warehouseman. Mr. Hunter stated that Debtor's inventory stored at IMP was not in marketable condition as it was stored outside and was in poor condition. He also found Debtor's inventory to be commingled with other steel products. Mr. Hunter subsequently sold the inventory for $123,-958.55.

Mr. Hunter testified that in February, 1991, he publicly auctioned certain assets of Debtor. He recalled that the sale of automobiles, titled in Debtor's name, generated $35,000; miscellaneous office equipment and furniture, including some computers, were sold for $47,662; a trailer, located in South Carolina, was sold for $5,000; some trucks in South Carolina were sold for $25,000; and Debtor's "800" tele-

phone numbers and trade name were sold for $50,000. According to Mr. Hunter, the sale proceeds totaled $160,372.50. (The court's totaling of these amounts is $162,-662 ($35,000 + $47,662 + $5,000 + $25,000 + $50,000 = $162,662.)) Mr. Hunter obtained no independent evaluation of Debtor's assets, prior to this sale, as he did not want to expend funds in obtaining same.

As trustee, Mr. Hunter anticipates a dividend to unsecured creditors of approximately 12%. (The court notes that Debtor's petition reflects total unsecured claims of $1,470,724.95; however, some 85 prepetition claims have been filed totaling in excess of $3,800,000, including a claim filed by defendant in the amount of $413,420.23 alleging it is oversecured and a claim filed by Sharon Steel Corp. in the amount of $1,208,225.) He opined that defendant had bettered its position as it had received payments from the sale of assets, and from sources not subject to the security agreement between Debtor and defendant.

Ms. Pat Almester testified that she had been employed by Debtor as its bookkeeper for 13 years, from 1978 until 1990. She was responsible for Debtor's daily financial transactions, including posting cash receipts, accounts payable and inventory. Ms. Almester stated that accounts receivable arose in two ways, through the sale of steel and through the brokerage of the product. Upon a sale, an account receivable was debited and upon payment, the account receivable was credited. These records were maintained on cards, during her initial employment and, later, on a computer. Other accounts receivable arose through officers' and employees' advances. Deposits to Debtor's sole account, a checking account with defendant, were recorded on deposit slips, after copying the checks, pulling the invoices and crediting the payments on the invoices.

Ms. Almester stated that Debtor's records also included miscellaneous entries, recorded in a general ledger book, reflecting non-trade receivables. Stipulated Exhibit S. These entries included repayment of officers' and employees' advances, payment of printing services provided to Waite

High School, a cash deposit from U-compute representing closure of that account and life insurance proceeds.

Ms. Almester also assisted Debtor's accountants in the preparation of the audited and reviewed financial statements by providing internal records for their review. She stated that inventory was valued on Debtor's books by totaling the cost of the inventory and the freight charge. Fixed assets were valued by deducting depreciation from the purchase price.

Ms. Almester was also responsible for payment on the line of credit and term note. She stated that Debtor was billed quarterly for interest on the line of credit. The amount of the principle payment on the line of credit was determined by her. She testified that payments on the line were made by applying the surplus in Debtor's account after deduction for operational expenses to the outstanding balance on the line. Monthly payments were made by Debtor on the term note.

Ms. Almester opined that certain business practices changed between August, 1989 and August, 1990. Prior to that time, accounts payable were paid within 30 days, generally, or earlier if a discount were given. However, at the direction of either Leo or Paul Goldner, she could not recall which gentleman, checks in payment of accounts payable were generated, but were not issued. Instead, all monies were paid to defendant, except funds necessary for continued operation of the business. As a result, Ms. Almester believed the line of credit was paid more quickly than it had been in the past.

Ms. Almester also opined that substantial purchases of rebar steel, a type of steel held by Debtor as inventory, were made at Messrs. Goldner's direction during this period. She, at the time of those purchases, questioned the need to obtain that inventory, as did some of the sales persons according to her. Ms. Almester testified that Mr. Leo Goldner held an office meeting, in response to the employees' concern. She could not, however, recall the explanation given at that time for these substantial purchases.

Mr. Leo Goldner testified that he was president and a 50% shareholder of Debtor during the time in issue, July, 1989 through August, 1990, and was actively involved in Debtor's operations during that time, except for some six weeks in February and March of 1990 when he was recuperating from surgery. During that recuperation time, although he may not have been present at the office, he participated in the management of Debtor.

Mr. Goldner stated that he was aware that Debtor was "out of formula" on the line of credit from September, 1989 until December, 1989, i.e., defendant's advances to Debtor on the $2,500,000 line of credit was limited to 80% of accounts receivable less than 90 days old plus 40% of inventory on hand. Stipulated Exhibit A. He believed the best way to reduce overhead, including the cost associated with application of the default rates, was to repay his personal loans to Debtor. In turn, Debtor would use these funds, according to Mr. Goldner, to repay defendant. Mr. Goldner realized $200,000 from his wife's sale of a Florida residence and paid this to Debtor. He also cashed in his life insurance policies, receiving some $80,000, and his pension program, resulting in $320,000. Mr. Goldner testified that the life insurance policies had been previously assigned to defendant, according to the terms of the loans. Defendant's Exhibits 62 and 63. He merely directed that the cash values be obtained from these policies. In total, Mr. Goldner testified that his actions resulted in a repayment of approximately $700,000 to Debtor. (Using Mr. Goldner's figures, however, the court notes that the total repayment was $600,000 ($200,000 + $80,000 + $320,000 = $600,000).)

Mr. Goldner testified that during his recuperation from surgery, he instructed his son, Paul Goldner, to purchase rebar in February, 1990. Generally, Debtor purchased this product earlier in the winter in order to take advantage of a price increase experienced in the spring during the onset of construction. However, after that purchase, the housing market declined and a recession was experienced; the steel mills

reduced the price of the product. As a result, Debtor did not obtain the price advantage anticipated by Mr. Goldner.

Mr. Goldner confirmed that Pat Almester was granted sole discretion to make payments on the line of credit. He stated that he did not instruct her to not pay the line of credit.

Mr. Douglas Andrews, previously employed as a senior commercial loan officer by defendant, was involved in the loan transactions with Debtor for some two and one-half years. He was employed by defendant, or its predecessors, from June, 1986 until May, 1991. Mr. Andrews stated that he, as a result of his involvement with clients in the steel industry for some eight years, was considered a specialist in that industry.

Mr. Andrews testified that Debtor was a long time, almost 40 year, customer of defendant. This long term relationship was of significance, according to Mr. Andrews, as it permitted defendant a unique understanding of Debtor's business, its management and its interaction with defendant. His understanding of Debtor's business and practices were in three areas: brokerage, a process wherein Debtor solicited accounts and attempted to locate product in fulfillment of those accounts; rebar, a process in which Debtor would buy secondary grade rebar and process it for inventory for contractors; and warehouse, a process in which Debtor inventoried product to make it readily available to a customer base.

After identifying the loan documents between the parties, Mr. Andrews explained that although Debtor was in technical default of the loans in October or November, 1989, a term that refers to Debtor's noncompliance with negative or affirmative covenants as set forth in the loan documents, he did not declare the loan in default; Debtor was current in its payments, but was "out of formula". Based upon the 40 year relationship between the parties, Mr. Andrews did not estimate Debtor's default under the loans to represent a "dire" situation, meriting the "calling" of the loans. He was aware that management

was cooperating and attempting to infuse new capital into the company. As a result, he believed defendant's interest was best served by permitting Debtor an opportunity to prepare a business plan. However, on February 12, 1990, the line of credit was frozen. Plaintiff's Exhibit Y; Joint Statement of Stipulated Facts and Exhibits at 11.

Mr. Andrews requested that Debtor submit a business plan that could be submitted to the loan committee. Such a plan would have permitted Mr. Andrews to turn Debtor's loans over to the asset based lending organization of defendant. This department would afford the opportunity for Debtor to obtain more funds than that which was available to Debtor through the present arrangement, but required intensive monitoring and auditing of Debtor's assets and liabilities. Because a business plan was not submitted by Debtor, the line of credit was not reopened for Debtor's access. Finally, Mr. Andrews indicated that from January through April, 1990, the relationship between Debtor and defendant was changing because defendant had frozen the line of credit and Debtor was purchasing inventory with funds previously used to pay accounts payable. In May, 1990, Debtor's payments on the outstanding loans deviated from the pattern previously followed by Debtor, according to Mr. Andrews. (The court would note that Ms. Almester testified that Debtor's business practices changed between August, 1989 and August, 1990. *See supra* p. 840.)

Ms. Therese A. Zmuda, employed as a C.P.A. with Holt, Kissoff & Mosley, Inc., testified that she had been retained by plaintiff to review Debtor's records. She had previously analyzed Debtor's financial status, assisting the unsecured creditors' committee, as early as October, 1989. Ms. Zmuda's testimony reflected that she had been engaged to perform several calculations for plaintiff, including a reconstruction of Debtor's financial position as early as 1989. *See* Plaintiff's Exhibit HH. Ms. Zmuda explained that an audited statement, such as that obtained by Debtor for March 31, 1989, requires an accountant to

investigate and verify information given the accountant by management. Plaintiff's Exhibit EE. A reviewed statement, such as that obtained by Debtor for March 31, 1990, is less intensive and does not require the same degree of testing of the information supplied by management. Stipulated Exhibit P. In valuing Debtor's assets and liabilities for these two years, Ms. Zmuda was asked to assume certain facts, adjusting Debtor's internally prepared balance sheets to reflect the fair value of assets, based upon those assumptions. These assumptions and adjustments were given to her by plaintiff and his counsel.

Ms. Zmuda adjusted the value of the accounts receivable, reducing it by $70,000, as a result of Mr. Hunter's representation that that amount was not collectible. Plaintiff's Exhibit II(1). She also reduced the equipment value by $200,000 because Debtor's balance sheet reflected a write-up in this amount; Debtor's balance sheet did not value fixed assets at cost minus depreciation. *Id.* (decreased asset of $766,458). Ms. Zmuda increased the value of Debtor's fixed assets by $112,467 to include monies received from the sale of certain assets, including four straighteners, automobiles and equipment. *Id.* She also included the lease obligation as a liability because the lease represented a related party transaction which should be "booked" on the financial statements. *Id.* (increased liability of $392,317).

Finally in calculating a fair valuation, Ms. Zmuda stated that according to generally accepted accounting principles (GAAP), a contingent liability must be entered on financial statements if two factors are present: the contingency is probable or likely to occur and the amount may be estimated. If one of these two factors does not exist, the liability may be footnoted, rather than included as an accrued liability in a financial statement prepared by an accountant. Her review of the work papers of Debtor's former accountant, Nachtrab, Cousino, O'Neil and Truehauf, would cause her to conclude that, at the time the 1989 audited statement and 1990 reviewed statement were prepared, the Sharon liability was appropriately reflected

in a footnote. Stipulated Exhibit P at 8; Plaintiff's Exhibit EE at 9. Ms. Zmuda's opinion, using the 1989 audited statement and 1990 reviewed statement, applying these adjustments to Debtor's valuation of assets and liabilities, was that Debtor was insolvent in August, 1989, continuing until March, 1990.

Ms. Zmuda also reviewed deposits into Debtor's checking account maintained at defendant's institution. *See* Plaintiff's Exhibit HH. She concluded that deposits from secured and non-secured sources were made to Debtor's single account. She expressed no opinion regarding the amounts representing either source. Deposits from advances on the line of credit between Debtor and defendant, letters of credit, officer receivables and payments from insurance companies, were considered by Ms. Zmuda to represent unsecured funds. Plaintiff's Exhibit H at 2–3. But *see supra* p. 840 (life insurance policies of Messrs. Goldner were assigned to defendant, Defendant's Exhibits 62 and 63 and were pledged as collateral, Stipulated Exhibit B). Ms. Zmuda opined that, based upon the relationship between the draws on the line of credit and the amount of accounts payable, Debtor was attempting to pay down the line of credit. Plaintiff's Exhibit PP (generally, as accounts payable increases, the draws on the line of credit increase as draws are used to purchase product, *see* Plaintiff's Exhibit OO; however, Plaintiff's Exhibit PP reflects an inverse relationship).

Ms. Zmuda was also engaged by plaintiff to calculate the lowest interim balance. Plaintiff's Exhibit HH at 3. Ms. Zmuda explained that the principle of that calculation is that there exists one depository account into which all funds are deposited and, therefore, commingled. According to Ms. Zmuda, certain of those deposited funds can be identified as received from secured sources; others are unidentifiable. Thus, the sum of these deposits is the overall account balance and the identifiable proceeds in a commingled account cannot be greater than the lower of the overall account balance or the net balance between

deposits and withdrawals of those identifiable proceeds. Ms. Zmuda explained that payments to defendant should be first drawn upon deposits that could be identified as proceeds from secured sources. The remaining funds, representing sources of unsecured monies, would be used to pay trade payables and other expenses. Ms. Zmuda stated that a presumption exists that payments are first made from unsecured funds and, once depleted, the payments are drawn upon the identifiable proceeds. The balance remaining, after a day's transactions, is carried over to the next day as its beginning balance.

Mr. Michael Clodfelter, a partner of Ernst & Young, defendant's witness, testified that he is a consultant for creditors and Debtors in bankruptcy situations, valuing privately held businesses. Three primary methods of valuation, according to Mr. Clodfelter, are: the income/earnings approach, based on the earnings generated by a business; the market comparable approach, valuing a business by public transactions and other markets; and a cost/asset approach, based on the costs of a business' assets. Mr. Clodfelter has valued businesses ranging from sales of less than $1,000,000 to multi-billion dollars.

Mr. Clodfelter testified that he reviewed internal documents of Debtor in valuing Debtor's business. Specifically, he used the accounts receivable balances as reflected in the borrowing base certificates, rather than the amounts reflected in the 1989 audited and 1990 reviewed statements. Mr. Clodfelter's value of inventories and fixed assets were obtained from Debtor's internal monthly balance sheets. He then totaled the inventory values for all locations, gross accounts receivable, other receivables, fixed assets and cash to obtain the perfected collateral total. Subtracting the total of the line of credit balance and term balances, resulted in an amount in excess of the outstanding loan balances due defendant. Using this formula, and its accompanying definition of collateral, no negative amounts were evident. Defendant's Exhibit 68. Mr. Clodfelter also valued collateral by excluding certain inventory at certain locations. Defendant's Exhib-

it 68. It was Mr. Clodfelter's opinion that Debtor was solvent through March, 1990; Debtor's solvency is more doubtful beginning in April, 1990.

Mr. John Wahl, retained by defendant, testified that he is employed as an auditing senior manager with Ernst & Young. He has worked on over 200 audits of companies, 60 of which he was only responsible to a partner. The size of companies upon which he has performed audits range from $4,000,000 to $2,000,000,000 in sales.

In evaluating Debtor's financial situation, Mr. Wahl reviewed Debtor's internal balance sheets from August, 1989 through August, 1990. He also reviewed Debtor's accountant's work papers of accounts receivable agings and inventory schedules. Upon review of Debtor's 1989 audited statement and 1990 reviewed statement, Mr. Wahl opined that he had no reason to conclude that the Sharon liability was improperly reflected.

Mr. Wahl calculated the lowest interim balance, utilizing Ms. Zmuda's definition of that term. He began his calculation by using the August 2, 1989, deposit. Defendant's Exhibit 69. He chose this date as the starting reference date as the opening balance was a negative amount. He then determined secured deposits by tracing them, if possible, to trade accounts receivable, draws on the line of credit and receipts on the line of credit. He calculated these amounts for each day, after August 2, 1989, applying defendant's payments against secured deposits, and determined that defendant had received only monies from secured deposits; defendant, according to Mr. Wahl, received no monies from unsecured cash. Upon cross examination, Mr. Wahl admitted that if he had incorrectly determined a deposit to be either secured or unsecured, the beginning balance for the next day would be incorrect.

## DISCUSSION

### Preferential Transfers

Plaintiff, in the first claim of his second amended complaint requests avoidance of all transfers made by Debtor to defendant

within one year before the filing of Debtor's petition, pursuant to 11 U.S.C. § 547(b). The elements of a preferential transfer require plaintiff to prove a transfer of an interest of Debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the Debtor before such transfer was made;

(3) made while the Debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

The court will separately analyze each element.

*§ 547(b)(1) and (2)—for the benefit of a creditor on account of an antecedent debt*

The payments in issue were made to defendant, a creditor of Debtor's estate; thus, the first element of § 547(b) is satisfied. The parties stipulated that the payments made to defendant were made on account of an antecedent debt. Joint Statement of Stipulated Facts and Exhibits at 6.

*§ 547(b)(3)—made while Debtor was insolvent*

The issue contested by defendant is the solvency of Debtor from August, 1989 until July, 1990. Defendant maintains that, based upon Debtor's audited and reviewed financial statements, of 1989 and 1990, respectively, Debtor was solvent during the relevant time period. Stipulated Exhibit P; Plaintiff's Exhibit EE. Plaintiff supports his allegation of insolvency based upon the treatment of the Sharon claim. *See* Stipulated Exhibit P at 8; Plaintiff's Exhibit EE at 9. That is, at the time the 1989 and 1990 financial statements were prepared, a lawsuit was pending in Pennsylvania against Debtor alleging breach of contract. As a result of Debtor's breach, Sharon obtained steel elsewhere and sued Debtor for its damages, the difference between the contracted price and the price actually expended in obtaining that product. Debtor's accountant reflected this liability as a footnote on those statements, and not as a current liability. Stipulated Exhibit P at 8; Plaintiff's Exhibit EE at 9.

Both parties' accounting experts, Ms. Zmuda and Mr. Wahl, admitted that, given the facts known at the time the 1989 and 1990 statements were prepared, and based upon GAAP, the Sharon liability was appropriately reflected as a footnote on the 1989 and 1990 financial statements. *See* Stipulated Exhibit P at 8; Plaintiff's Exhibit EE at 9. However, plaintiff asserts that this liability should be included in determining insolvency.

Initially, the court notes that insolvency is to be determined at the time of the transfer, not at the time the petition was filed. *In Re Flight Management, Inc.*, 99 B.R. 477, 478 (Bkrtcy.M.D.Fla. 1989). Additionally, the court must consult the bankruptcy code definitions in assessing the impact of the Sharon liability. Section 101(32) defines "insolvency" to mean a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation." "Debt" is defined as "liability on a claim." 11 U.S.C. § 101(12). "Claim" means:

right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.

11 U.S.C. § 101(5).

Since claims may be disputed or contingent, disputed or contingent liabilities must be included in determining total indebtedness for purposes of determining insolvency.

*In Re Sierra Steel, Inc.*, 96 B.R. 275, 279, 19 B.C.D. 269 (9th Cir.B.A.P.1989) (citation omitted).

■ This balance sheet test refers, then, to insolvency when a Debtor's liabilities exceed its assets, at a fair value. *See Sierra Steel*, 96 B.R. at 277; *In Re S.N. Brown Elec. Corp.*, 136 B.R. 598, 600, 22 B.C.D. 1002 (Bkrtcy.D.Mass.1992) (the test of solvency is whether the fair value of Debtor's assets exceeded its liabilities at the time of the transfer); *Flight Management, Inc.*, 99 B.R. at 478. In valuing Debtor's liability to Sharon, although GAAP are relevant, they are not controlling. *Sierra Steel*, 96 B.R. at 278. That is, this court is not compelled to conclude:

> that the bankruptcy court must follow GAAP in making solvency determinations. Requiring application of GAAP would make accountants and the board which promulgate GAAP the arbiters of insolvency questions. Clearly the Code provides that judges should make such decisions. Furthermore, there is no policy reason why judges should not be allowed to consider subsequent events such as the actual collection rate for receivables in valuing assets and determining liabilities. Thus although GAAP are relevant, they are not controlling in insolvency determinations.

*Sierra Steel*, 96 B.R. at 278. The court must reduce the contingent liability "to its present, or expected, value before a determination can be made whether the firm's assets exceed its liabilities." *Matter of Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir.1988) (citations omitted).

■ The parties admit that Debtor was insolvent on August 20, 1990. Joint Statement of Stipulated Facts and Exhibits at 7. The parties also stipulated that:

> 38. the claim brought against [Debtor] by [Sharon] for $1,208,225 was a contingent liability of [Debtor] throughout the one year period prior to the filing of the involuntary bankruptcy petition.

*Id.* at 8. The court concludes that because the Sharon liability was contingent, this liability is included within the insolvency determination. *Sierra Steel*, 96 B.R. at 279. Having made this conclusion, the court must now determine a fair value of that claim, and its effect upon the solvency issue.

The Sharon claim was listed as a contingent claim in excess of $1,500,000 on Debtor's 1989 and 1990 financial statements. Stipulated Exhibit P at 8; Plaintiff's Exhibit EE at 9. Debtor's assets are valued in the 1989 and 1990 statements at $4,181,176 and $2,462,121, respectively. Stipulated Exhibit P at 2; Plaintiff's Exhibit EE at 2. The liabilities, excluding stockholders' equity, are valued in the statements at $3,254,-995 for 1989 and $2,305,785 for 1990. Stipulated Exhibit P at 3; Plaintiff's Exhibit EE at 3. Plaintiff compromised the Sharon claim in an amount not to exceed $804,677, based upon his conclusion that Debtor was 100% liable for the $1,500,000 claim. Defendant's Exhibit 66 at 3.

As previously stated, the parties stipulated that the Sharon claim was a contingent liability of Debtor throughout the one year period prior to the filing of the involuntary petition for $1,208,225. Joint Statement of Stipulated Facts and Exhibits at 8. Accepting this value, the court concludes that $1,208,225 is the fair or "present or expected, value" of the Sharon claim at the time of the transfers in issue. *See Xonics*, 841 F.2d at 200.

Having concluded that the claim should be valued at $1,208,225, the court must include this figure in calculating Debtor's solvency. Although Ms. Zmuda and Mr. Clodfelter adjusted Debtor's value of its assets, *see* Plaintiff's Exhibit II and Defendant's Exhibit 68, the court finds that imposition of the $1,208,225 liability, regardless of the asset figure used, causes Debtor's liabilities to have exceeded its assets from August, 1989 until August, 1990.

First, adding the $1,208,225 Sharon claim as a liability to the 1989 and 1990 financial statements causes Debtor's assets to be insufficient to meet its liabilities (the court will use the liabilities figure which excludes stockholders' equity):

| 1989 total assets: | | $4,181,176 |
|---|---|---|
| liabilities | : | $3,254,995 |
| Sharon | : | $1,208,225 |
| | | ($ 282,044) |

Plaintiff's Exhibit EE at 2, 3.

| 1990 total assets: | | $2,462,121 |
|---|---|---|
| liabilities | : — | $2,305,785 |
| Sharon | : — | $1,208,225 |
| | | ($1,051,889) |

Stipulated Exhibit P at 2, 3. *See* Joint Statement of Stipulated Facts and Exhibits at 7, 8 (defendant does not contend that Debtor had any classification of assets during the one year pre-petition period which were not included in the financial statements, except whatever value should be attributed to: good will, trade name, "800" number service and going business value, which were sold by plaintiff for $50,000, *see supra* p. 839; nor does defendant contend that any of the liabilities included in the financial statements should be excluded from the balance sheets for purposes of determining the solvency of Debtor). Thus, including the Sharon claim as a liability, plaintiff has established that Debtor was insolvent in 1989 and 1990, based upon Debtor's 1989 and 1990 financial statements.

Second, Ms. Zmuda included the Sharon liability in her analysis as an adjustment of $2,033,133. Plaintiff's Exhibit II(1). Accepting her valuation of the assets, which include various adjustments, and applying $1,208,225 for accrued litigation liability, rather than $2,033,133, the court finds that Ms. Zmuda's figures evidence Debtor's insolvency:

| adjusted balances : | | ($1,934,891) |
|---|---|---|
| add in liability used: | + | $2,033,133 |
| subtract Sharon : | — | $1,208,225 |
| | | ($1,109,983) |

Plaintiff's Exhibit II(1) (the court will not recalculate the adjusted balances on Plaintiff's Exhibit II(2) and (3) as the adjusted balances on those two exhibits, representing November, 1989 and March, 1990, would result in a higher negative number than that calculated above).

Finally, using Mr. Clodfelter's figures, the court also finds evidence of Debtor's

insolvency, for the period in issue, one year pre-petition. Mr. Clodfelter calculated Debtor's net worth by totaling assets and subtracting the balances on the line of credit and term note therefrom. Defendant's Exhibit 68. Initially, the court notes that Mr. Clodfelter opined that Debtor was clearly solvent through March 31, 1990; April through July, 1990, was, according to Mr. Clodfelter, more doubtful. *See supra* p. 843. Indeed, 11 U.S.C. § 547(f) affords plaintiff a presumption of insolvency on and during the 90 days pre-petition, to-wit: May, 1990. Thus, the court will consider Mr. Clodfelter's calculations through April, 1990. Defendant's Exhibit 68 (the May, June and July, 1990 figures will not be considered as this period represents the months during which the presumption exists).

Viewing defendant's secured position in the light most favorable to it, the court will, for purposes of the solvency determination only, consider defendant's valuation of inventory for all locations as calculated by Mr. Clodfelter. Defendant's Exhibit 68. The highest collateral in excess of loan amounts for inventory for all locations as calculated by Mr. Clodfelter, is $1,018,636.83. *Id.* at 838 (month of 8/31/89). Mr. Clodfelter did not include the Sharon liability as, in his opinion, same would not represent a fair value of a contingent claim; its value was uncertain. Adjusting Mr. Clodfelter's net worth calculation to include the $1,208,225 Sharon liability, would cause Debtor's liabilities to exceed its assets:

| collateral in excess of loan amounts | : | $1,018,637 |
|---|---|---|
| Sharon | : — | $1,208,225 |
| | | ($ 189,588) |

Using testimony and evidence presented by both parties, the court is convinced that Debtor was insolvent at the time of the transfers, one year from the date of the petition. (As discussed *infra* p. 847, the relevant time period is one year.)

### § 547(b)(4)—reachback period

Plaintiff seeks avoidance of the transfers made within one year to defendant pursuant to § 547(b)(4)(B). Defendant held per-

sonal guaranties of Messrs. Goldners and the parties have stipulated that they were insiders. Joint Statement of Stipulated Facts and Exhibits at 6–7. Thus, the applicable time period is one year pre-petition, August, 1989. *See In Re C–L Cartage Co., Inc.*, 899 F.2d 1490 (6th Cir.1990) (citing *Levit v. Ingersoll Rand Financial Corp.*, 874 F.2d 1186 (7th Cir.1989) (*Deprizio* doctrine)). Furthermore, § 550(a)(1) permits the trustee who has successfully avoided a preference to recover from the creditor to whom it was paid.

*§ 547(b)(5)—comparison to hypothetical chapter 7 distribution*

■ Having concluded that Debtor was insolvent, and that the appropriate preferential period is one year before the filing of Debtor's petition, this court must next determine whether defendant received more than it would have had the transfers not been made. 11 U.S.C. § 547(b)(5).

Defendant asserts that plaintiff has failed to carry his burden of proof on this issue, citing *In Re Tenna Corp.*, 801 F.2d 819 (6th Cir.1986), in support of this assertion. In *Tenna*, the court determined that the date of the petition is the appropriate date for calculating a hypothetical liquidation analysis. *Id.* at 823. However,

> [u]nless the estate is sufficient to provide a 100% distribution, any unsecured creditor ... who receives a payment during the preference period is in a position to receive more than it would have received under a chapter 7 liquidation.

*In Re Chattanooga Wholesale Antiques, Inc.*, 930 F.2d 458, 465 (6th Cir.1991) (citation omitted).

Although the court concurs that plaintiff did not present evidence constructing a hypothetical liquidation analysis as of the date of Debtor's petition, the court, nevertheless, finds that plaintiff has carried his burden of proving this element.

Plaintiff testified that he anticipates a dividend of approximately 12%. *See supra* p. 839. Furthermore, the parties stipulated that Debtor was insolvent on August 20, 1990, the date of Debtor's petition. Joint Statement of Stipulated Facts and Exhibits at 7. Thus, construction of a hypothetical

liquidation analysis is not necessary in light of the parties' stipulation that Debtor was insolvent as of the date of its petition, plaintiff's testimony that a 12% distribution may be realized, and this court's finding that Debtor was insolvent within one year preceding the filing of the petition.

> We do not believe it was necessary to rely on *In re Tenna* in order to reopen the evidence in this case. Our decision in that case merely clarified the time at which the "more than" determination is to be made; the requirement that such a determination must be made was not an issue.

*Chattanooga*, 930 F.2d at 464. Because the estate will not provide a 100% distribution, plaintiff has carried his burden of proof, establishing that defendant has received more than if the transfer had not been made and it is entitled to avoidance of those transfers, unless defendant successfully defends against this preference claim.

*secured position: inventory*

■ Defendant defends against plaintiff's action claiming that it held a perfected security interest in Debtor's inventory located in Ohio, South Carolina, Indiana and New York, Debtor's accounts receivable and proceeds and Debtor's equipment and machinery. Trial Brief of Defendant Society Bank & Trust at 14. As such, § 547(c)(5), the "improvement in position" exception, may not be applicable. *See Matter of Missionary Baptist Foundation*, 796 F.2d 752, 759 (5th Cir.1986) (it is a commonplace that preference law exempts fully secured creditors from its grasp (citations omitted)); *Matter of Hale*, 15 B.R. 565, 567, 8 B.C.D. 434, 5 C.B.C.2d 759 (Bkrtcy.S.D.Ohio 1981) (we hold as a general rule that payments to a fully secured creditor during the 90 day period preceding the filing of bankruptcy will not be considered a preferential transfer). If defendant is a secured creditor, it must, then, establish that it did not improve its position from 90 days, or one year, pre-petition to the date of the filing of the petition. That is,

[a] creditor with a security interest in a floating mass, such as inventory or accounts receivable, is subject to preference attack to the extent he improves his position during the 90 day period before bankruptcy. The test is a two-point test, and requires determination of the secured creditor's position 90 days before the petition and on the date of the petition.

What has been referred to as a "two point measurement system" is set up.... If the transferee is better off ("has improved his position") on the second date than he was on the first date, there is, pro tanto, a preference. "Improvement of position" is defined ... as the reduction of a "deficiency" or its conversion into a surplus between the two dates.... Unless there is a deficiency (i.e., the loan is under collateralized) on the first date, there can be no preference under the draft. Intervening fluctuations in the relationship between debt and collateral during the ... period are ignored.

*Missionary Baptist Foundation*, 796 F.2d at 760, n. 11 (citations omitted). *See also Hale*, 15 B.R. at 567 (underlying rationale for the rule is that to the extent a secured creditor holding valuable collateral receives payment prior to bankruptcy, the amount of the secured claim is proportionately reduced (citation omitted)).

Plaintiff argues that

[t]he code has a clear and distinct definition of these terms, however, which would not include non-trade receivables or trade receivables reflected by an instrument or other writing. The evidence will show that, as of August 21, 1989, [defendant] only held a perfected security interest in the furniture, fixtures, equipment and account receivables located at 4239 Monroe Street, Toledo, Ohio and in the inventory and equipment located at 204 Olive Street, Andrews, South Carolina.

Plaintiff's Trial Brief at 10–11.

This court in its April 28, 1992 opinion and order denying defendant's motion to strike, denying plaintiff's motion for declaratory judgment and denying plaintiff's motion for partial summary judgment and scheduling pretrial conference, briefly addressed the posture of defendant's secured status. This court was not convinced that defendant had failed to perfect its interest in Debtor's collateral located outside Ohio. Also, the warehouses utilized by Debtor were rented public facilities; they were not assets owned by Debtor. Finally, this court noted that the purpose of a financing statement is to give notice of the existence of a security interest, *see Matter of Dayton Suzuki, Inc.*, 27 B.R. 915, 917 (Bkrtcy. S.D.Ohio 1983) (third parties searching the public files surely are on notice of the substance of the claimed collateral through a financing statement); thus, perfection may be accomplished by filing in the jurisdiction in which Debtor's office was located.

■ Initially, the court notes that although Debtor stored inventory at sites located in several states and did business in several states, it is undisputed that Debtor's offices were located on Monroe Street in Toledo, Ohio; Plaintiff testified that Debtor's principals occupied "sumptuous" offices. *See supra* p. 839. O.R.C. § 1309.-03(C)(2) provides that the jurisdiction in which Debtor is located governs perfection. Subsection (4) of that section states that Debtor's location is "his chief executive office." The "chief executive office" is:

the place from which in fact the Debtor manages the main part of his business operations. This is the place where persons dealing with the Debtor would normally look for credit information, and is the appropriate place for filing. The term "chief executive office" is not defined in this section or elsewhere in this act....

\*    \*    \*    \*    \*    \*

... other factors must be considered, such as the location of Board of Directors' meetings, management offices, payroll and other business records.

*In Re Astrocade, Inc.*, 31 B.R. 245, 248–49 (Bkrtcy.S.D.Ohio 1983) (quoting *Aoki v. Shepherd Machinery Co.*, 665 F.2d 941 (9th Cir.1982)). Thus, the issue of defen-

dant's perfection of its security interest as to Debtor's collateral is determined in accordance with the Ohio Revised Code as this is the jurisdiction in which Debtor is located.

With three exceptions, not applicable herein, perfection is accomplished by filing in the office of the secretary of state and in the office of the county recorder in the county in which Debtor's place of business is located. O.R.C. § 1309.38(A)(4). It appears that defendant has properly perfected its security interest by a dual filing in Lucas County and State of Ohio as to the collateral listed in those documents. Stipulated Exhibit H.

*secured position: checking account—proceeds*

■ Defendant asserts that the perfection of its collateral extends to Debtor's checking account, as the security agreement covered "accounts." Plaintiff maintains that "accounts" as described within the financing statements do not include Debtor's checking account. The court concurs with plaintiff.

Debtor maintained, during the one year period prior to its petition, one checking account at defendant's institution into which it deposited all funds. Joint Statement of Stipulated Facts and Exhibits at 9. "Account" as defined in O.R.C. § 1309.-01(A)(15) refers to the ordinary commercial account receivable, 83 O.Jur.3d *Secured Transactions* § 103 (1988), and is defined as:

> any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper. . . .

O.R.C. § 1309.01(A)(15). Furthermore, § 1309.01(A)(5) defines "deposit account" to mean "a demand, time, savings, passbook or like account maintained with a bank." A checking account, no doubt, would be included within this definition, further supporting this court's conclusion that "account" does not extend defendant's security interest to the checking account maintained by Debtor. Finally, O.R.C. § 1309.04(K) provides that § 1309, *et seq.*, does not apply "to a transfer of an interest in any deposit account . . . except under § 1309.25." *See Cissell v. First Nat. Bank of Cincinnati*, 476 F.Supp. 474, 491 n. 8 (S.D.Ohio 1979) (this is in accord with the general view that one cannot perfect a security interest in a bank account); *In Re Charter First Mortg., Inc.*, 56 B.R. 838, 842 (Bkrtcy.D.Or.1985) (the account described in the stipulated facts are "deposit accounts"; ORS chapter 79, which governs secured transactions, does not apply to the transfer of an interest in a "deposit account" "except as provided with respect to proceeds"; deposit accounts cannot be the collateral itself). Defendant's security interest, then, does not extend to Debtor's checking account.

■ Defendant's secured position, however, is limited by O.R.C. § 1309.25(B); its security interest continues only in "any identifiable proceeds." O.R.C. § 1309.-25(B). As previously stipulated, Debtor maintained one checking account into which all funds were deposited. Joint Statement of Stipulated Facts and Exhibits at 9. Ms. Almester testified that she kept a general ledger book of non-trade receivables which reflected deposits from various sources, including deposits from U–Compute, Waite High School and officer and employee advances. *See supra* pp. 839–40. Because Debtor's account included proceeds from many sources, defendant's security interest extends only to those proceeds which it can identify as representing proceeds from its collateral. Defendant bears the burden of proving this amount. *Charter First Mortg., Inc.*, 56 B.R. at 841 (citations omitted).

■ The commingling of cash proceeds, however, does not necessarily prevent defendant from identifying those funds to which it is entitled. *In Re Chicago Lutheran Hosp. Ass'n.*, 89 B.R. 719, 734 (Bkrtcy.N.D.Ill.1988). The lowest interim balance rule permits a creditor to identify proceeds subject to its security interest. *Id.*

> The rule presumes that proceeds can be "identified" once deposited into an account as long as the account balance is equal to or greater than the amount of

the proceeds deposited, notwithstanding that other funds may be paid out of the account.

*Id.* Defendant "bears the burden of proving the lowest interim balance." *Id.*

█ Mr. Wahl testified that he determined secured deposits by tracing the deposits, "if possible," to trade accounts. *See supra* p. 843. He could not state definitively that all such deposits were traceable. Furthermore, he admitted that if he erroneously determined a deposit to represent a secured source, the calculation for each day thereafter would be incorrect. *Id.* Finally, Mr. Wahl's "assumptions used in lowest intermediate balance calculation" include:

5) Principal payments to [defendant] on the line of credit and the advance payments to [defendant] on the term loan were deducted from the secured cash only.

\* \* \* \* \* \*

7) Counsel identified one deposit by Leo Goldner which had been earmarked for payment on line of credit.

Defendant's Exhibit 69 at 1. These assumptions persuade the court that Mr. Wahl's conclusion is unconvincing. Defendant received payments of principal and interest. *See generally* Joint Statement of Stipulated Facts and Exhibits at 12 (interest on term note reduced by $37,041.99). Mr. Wahl's assumptions do not reflect that interest payments were made from secured deposits. Furthermore, as discussed *infra* pp. 852–53, no earmarking existed; thus, Mr. Wahl's calculation is invalid as his assumptions included a deposit earmarked for payment to defendant. Defendant's Exhibit 69 at 2 ($214,000 from Leo Goldner earmarked for payment on line of credit). The court is not persuaded that defendant is entitled to any of the proceeds in or from Debtor's sole commingled account. Defendant has failed to carry its burden of proof on this issue.

█ Defendant also argues that despite any commingling, it is entitled to a right of setoff. Defendant may have had a prepetition right to setoff; however, no affirmative act was taken in exercise of that right. Initially, then, the court notes that defendant's setoff argument is superfluous.

Additionally, defendant's post-petition right to setoff is prohibited by 11 U.S.C. § 362(a)(7). Furthermore,

[a]lthough cash deposits to bank accounts establish an automatic Debtor-creditor relationship, checking account deposits only place liability for the indebtedness on the bank when such deposits are actually paid to the bank.... Until such checks are paid to a bank, the relationship between the bank and customers is agent-principal, rather than Debtor-creditor, and such "indebtedness" may not provide the basis for setoff.

*Matter of Springfield Casket Co., Inc.,* 21 B.R. 223, 228, 9 B.C.D. 473 (Bkrtcy. S.D.Ohio 1982) (citations omitted). *See also Cissell,* 476 F.Supp. at 495 (in a case involving a preferential transfer under the bankruptcy act, the court stated that a bank is on a different footing than other general creditors since even though the depositor was insolvent and knowledge of this fact could be charged against the bank at the time when the deposit was made, the bank is still entitled to apply the deposit on its claim so long as it was accepted in good faith, in the ordinary course of business). Defendant's contention that it could have exercised its right of setoff is of no merit.

█ Finally, defendant is limited, as of the date of the petition, to the amount to which it is entitled by identification of proceeds, pursuant to O.R.C. § 1309.25(D). That statute provides:

In the event of insolvency proceedings instituted by or against a Debtor, a secured party with a perfected security interest in proceeds has a perfected security interest only in the following proceeds:

(1) in identifiable non-cash proceeds and in separate deposit accounts containing only proceeds;

(2) in identifiable cash proceeds in the form of money which is neither commingled with other money nor deposited in a

deposit account prior to the insolvency proceedings;

(3) in identifiable cash proceeds in the form of checks and the like which are not deposited in a deposit account prior to the insolvency proceedings; and

(4) in all cash and deposit accounts of the Debtor in which proceeds have been commingled with other funds, but the perfected security interest under this division is:

(a) subject to any right of set-off; and

(b) limited to an amount not greater than the amount of any cash proceeds received by the Debtor within ten days before the institution of the insolvency proceedings, less the sum of (i) the payments to the secured party on account of cash proceeds received by the Debtor; and (ii) the cash proceeds received by the Debtor during such period to which the secured party is entitled under divisions (D)(1) to (3) of this section.

If defendant has a perfected security interest, that interest extends only to identifiable proceeds which have not been commingled or commingled cash in a limited way. *See Cissell*, 476 F.Supp. at 495 (if funds are not identifiable due to commingling with other funds which were not proceeds of the creditor's interest, the creditor is limited to the amount recoverable under § 1309.-25(D)(4)(b)).

[O]nce cash proceeds are either commingled with other funds or deposited into a deposit account, they cease to be "identifiable," ... and the secured creditor's post-petition right to trace those funds ceases to exist. The secured creditor's sole right·to recover proceeds is then governed by O.R.C. § 1309.25(D)(4), which sets forth a formula for determining the creditor's right to recovery from the bank account.

*Triple A. Coal Co., Inc.*, 55 B.R. 806, 811 (Bkrtcy.S.D.Ohio 1985).

█ As previously discussed, the parties stipulated that Debtor maintained one checking account into which it deposited all funds. Joint Statement of Stipulated Facts and Exhibits at 9. In closing argument, plaintiff's counsel stated that defendant's

recovery under § 1309.25(D)(4) was limited to Debtor's account balance on the date of its petition. Defendant's counsel asserted that because defendant was a secured creditor, § 1309.25 does not apply. The court does not concur. As previously found, defendant was secured as to that collateral described in the financing statements; however, it was not secured as to Debtor's checking account. As a result, because the deposit of funds to Debtor's checking account were commingled, they were not identifiable as monies deposited to that account included funds from assets not subject to defendant's security interest. *Triple A. Coal Co.*, 55 B.R. at 811; *see supra* p. 840 (Mr. Goldner used funds from his wife's sale of a Florida residence and from his pension program in repayment of officer receivable). Defendant has failed to establish any amount to which it is entitled pursuant to O.R.C. § 1309.25(D)(4).

## § 547(c)(2)—payments in the ordinary course of business

█ Defendant also asserts that the payments it received were in the ordinary course of business. Defendant has the burden of proving the nonavoidability of a transfer under § 547(c)(2). *In Re Fred Hawes Organization, Inc.*, 957 F.2d 239 (6th Cir.1992).

Mr. Douglas Andrews testified that he was responsible for Debtor's loans and was familiar with the payments thereunder. Furthermore, Mr. Andrews indicated that he handled some six to twelve steel customers at one time during his employment with defendant, and another banking institution prior thereto; he was, then, familiar with the industry, generally, and its practices and financing arrangements. *See supra* p. 841. Mr. Andrews stated that Debtor's payments on the line of credit were according to the terms of the agreements between the parties, and to the ordinary course of business practice established between Debtor and defendant. The payments were also reflective of the type, nature and frequency as those in the steel industry, according to Mr. Andrews. Finally, the principal payments made on the line

of credit were, until May, 1990, representative of the ordinary course of business between Debtor and defendant and that of the industry. *See supra* pp. 841–42.

The purpose of the exception provided in § 547(c)(2)

> is to leave undisturbed normal financing relations, because it does not detract from the general policy preference section to discourage unusual action by either the Debtor or his creditors during the Debtor's slide into bankruptcy.

*Fred Hawes*, 957 F.2d at 243 (quoting legislative history). In order to successfully establish that a payment was received in the ordinary course of business under § 547(c)(2), defendant must prove "that the debt and its payments are ordinary in relation to other business dealings between that creditor and that Debtor" and "that the payment is ordinary in relation to the standards prevailing in the relevant industry." *Id.* at 244 (citation omitted); 11 U.S.C. § 547(g). This analysis is fact specific, requiring an examination of the "timing, amount and manner a transaction was paid and the circumstances under which the transfer was made." *Fred Hawes*, 957 F.2d at 244 (citing *In Re Yurika Foods Corp.*, 888 F.2d 42, 45 (6th Cir.1989)).

Plaintiff conceded, in closing argument, that Debtor's debt was incurred in the ordinary course of business; plaintiff denied that it was repaid in the ordinary course of business and according to ordinary business terms. Mr. Andrews testified that he was considered an expert in the steel industry as to financial arrangements and it was his opinion that Debtor's payments on the debt were in accordance with the practice between the parties and the practice in the industry, until May, 1990. *See supra* pp. 841–42. However, Ms. Almester testified that payments deviated from Debtor's earlier practice, beginning in August, 1989. *See supra* p. 840. She testified that she was instructed not to release the checks payable to trade creditors; rather, those funds previously used to pay trade creditors, were dedicated to repayment of the obligations owed defendant, which repayment, benefitted Messrs.

Goldner, discharging their personal guarantees of those obligations. Mr. Hunter's opinion, based upon his review of Debtor's books was that Debtor began repaying the line of credit in February or March, 1990. *See supra* pp. 838–39. Finally, reviewing Stipulated Exhibit O, which reflects no draws upon the line of credit after it was frozen in February, 1990, the court concludes that those payments after February, 1990, reflect accelerated repayment of that obligation resulting in payment in full prior to Debtor's petition; same were not in the ordinary course of business and are recoverable by plaintiff.

### *§ 547(c)(4)—transfer for subsequent new value*

Defendant asserts that any payments received by it are excepted from preferential recovery as it subsequently advanced funds to Debtor. Although this defense may be meritorious as to advances before the line of credit was frozen, February 12, 1990, it is not supported by the evidence as to payments made after February 12, 1990. No further advances were made after February 15, 1990; only payments were made. Stipulated Exhibit O at 15. Thus, the repayment of $2,000,000 after February, 1990 may not be successfully defended by assertion of § 547(c)(4).

### *earmark rule*

Defendant also claims that certain funds paid to it were earmarked funds, specifically, the life insurance proceeds and the sale proceeds of Mr. Leo Goldner's wife's residence. *See supra* p. 840. On this issue, the parties have stipulated that:

> 45. Leo Goldner did not pay any funds directly to [defendant] to reduce [Debtor's] line of credit or term note debt during the one year period prior to the filing of the involuntary bankruptcy petition. However, [defendant] reserves the right to present evidence on the "earmark doctrine."
>
> 46. Paul Goldner did not pay any funds directly to [defendant] to reduce [Debtor's] line of credit or term note debt during the one year period prior to the

filing of the involuntary bankruptcy petition. However, [defendant] reserves the right to present evidence on the "earmark doctrine."

47. Any funds paid by or on behalf of Leo Goldner to [Debtor] for the purpose of reducing the Debtor's line of credit or term note debt with [defendant] during the one year period prior to the filing of the involuntary bankruptcy petition were deposited into the Debtor's general depository account. However, [defendant] reserves the right to present evidence on the "earmark doctrine."

48. Any funds paid by or on behalf of Paul Goldner to [Debtor] for the purpose of reducing the Debtor's line of credit or term note debt with [defendant] during the one year period prior to the filing of the involuntary bankruptcy petition were deposited into the Debtor's general depository account. However, [defendant] reserves the right to present evidence on the "earmark doctrine."

49. Any funds paid by or on behalf of Leo Goldner to [Debtor] for the purpose of reducing the Debtor's line of credit or term note debt with [defendant] guaranteed by him were deposited with other monies in the Debtor's depository account.

50. Any funds paid by or on behalf of Paul Goldner to [defendant] for the purpose of reducing the Debtor's line of credit or term note debt with [defendant] guaranteed by him were deposited with other monies in the Debtor's depository account.

Joint Statement of Stipulated Facts and Exhibits at 9–10.

■■■ "The earmark rule requires that the party making the loan choose the recipient of the funds." *In Re Hartley*, 825 F.2d 1067, 1071–72 (6th Cir.1987) (citation omitted). The earmarking doctrine prohibits a trustee from avoiding a transfer, as preferential, as the funds to be recovered never belonged to the Debtor; "Debtor never controlled the money, and the money never became a part of the Debtor's assets." *Id.* at 1070 (citation omitted). That is, in order for a trustee to avoid a prefer-

ence under § 547, Debtor must have an interest in the property transferred, diminishing Debtor's estate. *Coral Petroleum, Inc. v. Banque Paribas–London*, 797 F.2d 1351, 1355 (5th Cir.1986).

Specifically, then, earmarking applies:

"[i]n cases where a third person makes a loan to a Debtor specifically to enable him to satisfy the claim of a designated creditor, the proceeds never become part of the Debtor's assets, and therefore no preference is created. The rule is the same regardless of whether the proceeds of the loan are transferred directly by the lender to the creditor or are paid to the Debtor with the understanding that they will be paid to the creditor in satisfaction of his claim, so long as such proceeds are clearly 'earmarked.' "

*Id.* at 1356 (quoting 4 *Collier on Bankruptcy* ¶ 547.25 at 547–101–102 (15th ed. 1986)). *See also In Re Bohlen Enterprises, Ltd.*, 859 F.2d 561, 565 (8th Cir.1988) (when new funds are provided by the new creditor to or for the benefit of the Debtor for the purpose of paying the obligation owed to the old creditor, the funds are said to be "earmarked" and the payment is held not to be a voidable preference); *Hartley*, 825 F.2d at 1070 (when a third person loans money to a Debtor specifically to enable him to satisfy the claim of a designated creditor, the general rule is that the proceeds are not the property of the Debtor and, therefore, the transfer of the proceeds to the creditor is not preferential).

■■■ Mr. Leo Goldner testified that he paid certain funds to Debtor corporation in repayment of officer receivables, directing the bookkeeper, Ms. Almester, to pay these funds to defendant. *See supra* p. 840. Notwithstanding Mr. Goldner's testimony, the court is not persuaded that these funds were earmarked. The funds were deposited into Debtor's account, becoming part of Debtor's assets. Upon Debtor's payment of these funds to defendant, these funds were commingled with other deposits, according to Ms. Almester; thus, Debtor's estate was diminished and no earmarking existed. Furthermore, Mr. Goldner did not control disposition of those funds; he mere-

ly directed Ms. Almester to pay over to defendant this amount. Defendant failed to present evidence from which the court could conclude that Mr. Goldner's officer repayment is traceable to a payment on the outstanding loan balances to defendant. Nor could it do so since Ms. Almester had discretion in determining the amount and time of these payments. Thus, defendant's assertion that these monies were earmarked is unpersuasive as Mr. Goldner did not directly pay over these amounts, nor control repayment of same to defendant.

*calculation*

Having found that the payments, after February, 1990, were not made in the ordinary course of business, the court must next determine that amount which may be avoided by plaintiff, as preferential.

Defendant was repaid $2,000,000 on the line of credit, after February, 1990. Defendant has failed to rebut plaintiff's claim of preferential transfer as to this amount. As a result, the court finds that same is subject to avoidance. *See Fred Hawes,* 957 F.2d at 242 (defendant has the burden of proving the nonavoidability of a transfer under § 547(b)(2), 11 U.S.C. § 547(g), and must prove each of the three elements of § 547(c)(2) by a preponderance of the evidence (citation omitted)).

Additionally, the parties stipulated to the following facts:

11. After February 17, 1990 up to and including August 20, 1990, [Debtor] paid a total of $111,457.44 to [defendant] to reduce the principal amount owed on the term note

....

12. After February 17, 1990 up to and including August 20, 1990, [Debtor] paid a total of $37,041.99 to [defendant] to reduce the interest owed on the term note....

Joint Statement of Stipulated Facts and Exhibits at 3. As a result, the court finds that plaintiff is entitled to avoid $2,148,-499.43 representing preferential transfers from Debtor to defendant ($2,000,000 (line of credit transfers) + $111,457.44 (term note transfers of principal) + $37,041.99 (term note transfers of interest) = $2,148,-499.43).

### Fraudulent Transfers

■ Plaintiff, in his second claim requests that the transfers within one year of Debtor's petition, be avoided as fraudulent, pursuant to 11 U.S.C. § 548 which permits the trustee to:

avoid any transfer of an interest of the Debtor in property, or any obligation incurred by the Debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the Debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the Debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted....

11 U.S.C. § 548(a)(1). Thus, plaintiff must prove that:

1. the Debtor had an interest in the property;
2. the property was transferred within one year of the Debtor's petition; and
3. the Debtor made the transfer with actual intent to hinder, delay, or defraud a creditor.

*Matter of Warner,* 65 B.R. 512, 519 (Bkrtcy.S.D.Ohio 1986) (citation omitted).

While each fact does not have to demonstrate actual fraud, the facts taken together must lead to the conclusion that actual fraud existed. Courts, however, are aware that there is a difference between actual and constructive fraudulent intent. Regardless of the ability of courts to infer actual fraudulent intent from the presence of "badges of fraud," actual fraudulent intent requires a subjective evaluation of the Debtor's motive.

*In Re Jeffrey Bigelow Design Group, Inc.,* 956 F.2d 479, 484 (4th Cir.1992) (citations omitted).

■ The court finds well taken plaintiff's assertion that Debtor's payments to defendant are voidable as fraudulent. Ms. Almester testified that the procedure for

repaying the loans changed between August, 1989 and August, 1990, at Mr. Goldner's direction. *See supra* p. 840. Additionally, Mr. Andrews opined that the manner and amount of repayment changed after April, 1990. *See supra* pp. 841–42. That is, the line of credit was frozen on February 12, 1990; total repayment of this $2,000,000 line was made by August, 1990. Stipulated Exhibit O. Finally, Ms. Zmuda testified regarding the relationship between the line of credit and accounts payable; those amounts became inversely related in May, 1990. *See* discussion *supra* p. 842 and Plaintiff's Exhibit PP. Considering this testimony, the court finds evidence of Debtor's actual fraudulent intent.

Debtor's motive and scheme, as devised by Mr. Leo Goldner, was to accelerate the repayment of the debt to defendant in order to absolve his own personal guarantee. At Mr. Goldner's direction, checks in payment of trade receivables were generated but not released. *See supra* p. 840. Instead, these funds were paid on the outstanding line of credit with defendant. *Id.* That is, retention of the funds allocated to payment of trade creditors permitted Debtor to obtain inventory and repay defendant, while incurring a debt in favor of trade creditors to the detriment of those trade creditors. Debtor's estate was depleted by the funds paid to defendant, which funds could have been used to pay all of the unsecured creditors pro rata.

This court's finding of actual fraudulent intent is supported by Mr. Goldner's "general scheme or plan to strip the Debtor of its assets with no regard to the needs of the creditors." *In Re F & C Services, Inc.,* 44 B.R. 863, 872, 11 C.B.C.2d 1126 (Bkrtcy. S.D.Fla.1984) (citations omitted). That is,

> [w]here the transferee or obligee is in a position to dominate or control the Debtor's disposition of his property, however, his intent to hinder, delay, or defraud creditors may be imputed to the Debtor to render the transfer or obligation fraudulent within § 548(a)(1) without respect to the actual purpose of the Debtor transferor.

4 *Collier on Bankruptcy* ¶ 549.02 at 548–35 (15th ed. 1992). In the instant situation, Mr. Goldner, an indirect transferee as a result of the discharge of his personal guarantee on the debt due defendant, was in a position to control the disposition of Debtor's property and benefitted from Debtor's repayment of the line of credit and term note. His intent is, then, imputed to Debtor, rendering the transfers in issue fraudulent. The court finds that plaintiff has carried its burden of proof, demonstrating that the transfers made after February, 1990 were fraudulent and avoidable by the trustee. Debtor made payments to defendant, within one year of Debtor's petition, with actual intent to hinder, delay or defraud a creditor, specifically trade creditors. Therefore, as previously calculated, the court finds that plaintiff may avoid $2,148,499.43 representing fraudulent payments to defendant. *See supra* p. 854.

### Post–Petition Payments

Plaintiff in his fourth claim requests recovery of all funds paid to defendant, post-petition, "amounting to approximately $8,000 per month." In closing argument, plaintiff's counsel opined that this amount is $25,713.21, representing three term payments for September, October and November, 1990.

The parties stipulated that:

52. The establishment of a post-petition deposit account at [defendant] created no new security interest in favor of [defendant].

53. Due to the objection of the creditors' committee, Judge Speer did not make any findings as to the nature or extent of the security interest of [defendant] in ordering the establishment of a post-petition cash deposit account.

54. The post-petition security interest of [defendant] was limited to whatever it proved to be pre-petition and no explicit or implicit finding on the extent or nature of that interest is found in the court's ruling establishing the post-petition cash account.

Joint Statement of Stipulated Facts and Exhibits at 11. Notwithstanding these stipulations, however, the court finds that

Debtor's payment to defendant of $25,713.21 was appropriate.

Pursuant to this court's November 15, 1990 order continuing entry on motion for continued authority to use cash collateral, Debtor's continued use of cash collateral was authorized as provided in the prior October 2, 1990 entry. Specifically, the October 2, 1990 entry authorized Debtor

> to pay to [defendant] when the same are due in accordance with the underlying note, the sum of eight thousand five hundred seventy-one dollars and twenty-seven cents ($8,571.27) as current payments on the existing term loan from [defendant] to Debtor.

Entry on Motion for Continued Authority to Use Cash Collateral at 3 (Oct. 2, 1990). Debtor operated under chapter 11 for some three months, from August 28, 1990 until December 6, 1990. *See supra* p. 838. Following the cash collateral order, Debtor made three payments on the term note in the amount of $8,571.27; this figure approximates the $25,713.21 plaintiff seeks to recover ($8,571.27 × 3 = $25,713.81). However, this amount is not susceptible to plaintiff's preferential attack.

The facts in *Chattanooga Wholesale*, 930 F.2d 458, *supra* p. 847, are analogous to those of the instant case as to this issue. In *Chattanooga*, Debtor and the bank entered into a stipulated entry authorizing Debtor to use cash collateral and make adequate protection payments; the court approved same. *Id.* at 460. After conversion of Debtor's case, in *Chattanooga*, the trustee instituted an action, pursuant to §§ 547(b) and 549(a) to recover pre-petition and post-petition payments as a result of the court's finding that the bank's claimed lien was unperfected. *Id.* at 461. The court did not permit the trustee to recover those payments made during an ongoing chapter 11.

As in *Chattanooga*, this court finds a party should be able to "rely on the payments being final." *Chattanooga*, 930 F.2d at 463 (citation omitted). Defendant should be permitted to rely on the post-petition payments, authorized by the cash collateral order, as being final. The court will not, then, avoid these payments.

Plaintiff is, then, entitled to avoid those pre-petition preferential and fraudulent transfers totaling $2,148,499.43 and should be awarded judgment accordingly.

In light of the foregoing, it is therefore

ORDERED that plaintiff/trustee John J. Hunter be, and hereby is, granted judgment against defendant Society Bank & Trust in the amount of $2,148,499.43.